Index No. 21-CV-7779 (CM)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CLEMENTINE COMPANY LLC, d/b/a THE
THEATER CENTER, WEST END ARTISTS
COMPANY d/b/a THE ACTORS TEMPLE THEATRE,
SOHO PLAYHOUSE, INC., d/b/a SOHO PLAYHOUSE
INC. d/b/a SOHO PLAYHOUSE, CARAL LTD. d/b/a
BROADWAY COMEDY CLUB,

                                                          Plaintiffs,

                         -against-

BILL de BLASIO, in his official capacity as Mayor of
New York City,

                                                          Defendant.

## MEMORANDUM OF LAW BY DEFENDANT BILL DE BLASIO IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# GEORGIA M. PESTANA

*Corporation Counsel of the City of New York*
*Attorney for Defendant Mayor Bill de Blasio*
100 Church Street, Room 5-318
New York, New York 10007-2601

*Of Counsel:    Aimee Lulich*
*On the Memorandum: Scali Riggs*
*Tel:  (212) 356-2369*

Matter No. 2021-028101

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF FACTS ......................................................................... 2

STANDARD OF REVIEW ....................................................................... 8

ARGUMENT

    POINT I

                PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS ...................................9

                A.   Key to NYC Should be Upheld Under Jacobson .........................................................................9

                B.   Plaintiffs Are Not Likely to Succeed on their First Amendment Claim.......................................11

                      1. The Key to NYC Does Not Regulate Speech or Expression......................................... 12

                      2. Key to NYC Is Content-Neutral .............................. 14

                      3. Key to NYC Survives Intermediate Scrutiny............................................................. 16

                  C.   Plaintiffs Are Not Likely to Succeed on their Equal Protection Claim.......................................17

                D.   Plaintiffs Lack Standing.......................................21

    POINT II

                PLAINTIFFS CANNOT MEET ANY OF THE REMAINING REQUIREMENTS FOR ISSUANCE OF A PRELIMINARY INJUNCTION .................................23

CONCLUSION............................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                                          **Pages**

In Re Abbott,
   954 F. 3d 772 (5th Cir Apr. 7, 2020) ......................................................................................10

Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,
   570 U.S. 205 (2013)..............................................................................................................11

Alliance for the Wild Rockies v. Cottrell,
   632 F.3d 1127 (9th Cir. 2011) ...............................................................................................8

Barr v. Am. Ass'n of Political Consultants,
   140 S. Ct. 2335 (2020)..........................................................................................................14

Butler v City of NY,
   2021 US Dist LEXIS 170311 (SDNY Sep. 8, 2021)...............................................................9

Carney v. Adams,
   141 S. Ct. 493 (2020)............................................................................................................20

Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,
   561 U.S. 661 (2010)..............................................................................................................14

Church of Am. Knights of the Ku Klux Klan v. Kerik,
   356 F.3d 197 (2d Cir. 2004)..................................................................................................12

Cincinnati v. Discovery Network,
   507 U.S. 410 (1993)..............................................................................................................15

City of Cleburne v. Cleburne Living Ctr., Inc.,
   473 U.S. 432 (1985)........................................................................................................17, 18

Clark v. Jeter,
   486 U.S. 456 (1988)..............................................................................................................20

Clementine Co., et al. v. Cuomo,
   No. 20 Civ. 8899 (CM), 2020 U.S. Dist. LEXIS 233483,
   2020 WL 7321504 (S.D.N.Y. Dec. 11, 2020) ......................................................................19

Columbus Ale House v. Cuomo,
   495 F. Supp. 3d 88 (E.D.N.Y. Oct. 16, 2020).......................................................................20

Drakes Bay Oyster Co. v. Jewell,
   747 F.3d 1073 (9th Cir. 2014) ...............................................................................................22

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,
   528 U. S. 167 (2000)..............................................................................................................20

**Cases**                                                                                 **Pages**

Gen. Media Communs. v Cohen,
   1997 U.S. No. 97-6092 App. LEXIS 40571 (2d Cir. 1997) ....................................................19

Heller v. Doe,
   509 U.S. 312 (1993)...............................................................................................................17

Hobbs v. County of Westchester,
   397 F.3d 133 (2d Cir. 2005).........................................................................................11, 14, 16

Hollingsworth v. Perry,
   570 U.S. 693 (2013)...............................................................................................................20

Jacobson v. Massachusetts,
   197 U.S. 11 (1905)...................................................................................................9, 10, 11, 17

Lehr v. Robertson,
   463 U.S. 248 (1983)...............................................................................................................17

Lujan v. Defs. of Wildlife,
   504 U.S. 555 (1992)...............................................................................................................20

Mastrovincenzo v. City of New York,
   435 F.3d 78 (2d Cir. 2006)...............................................................................................11, 16, 17

Mazurek v. Armstrong,
   520 U.S. 968 (1997)..................................................................................................................8

McDonald v. City of Chicago,
   561 U.S. 764 (2010)........................................................................................................... 19-20

Nat'l Institute of Family & Life Advocates v. Becerra,
   138 S.Ct. 2361 (2018)......................................................................................................11, 14

New Motor Vehicle Bd. Of California v. Orrin W. Fox Co.,
   439 U.S. 96 (1978).................................................................................................................20

New York City C.L.A.S.H. v. City of New York,
   315 F. Supp. 2d 461 (S.D.N.Y. April 7, 2004) .......................................................................13

Nordlinger v. Hahn,
   505 U.S. 1 (1992)...................................................................................................................17

Police Dep't of Chicago v. Mosley,
   408 U.S. 92 (1972).................................................................................................................15

**Cases**                                                                                                    **Pages**

Reed v. Town of Gilbert,
    576 U.S 155 (2015)...................................................................................11, 14

Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,
    490 U.S. 477 (1989)...................................................................................9

Romer v. Evans,
    517 U.S. 620 (1996)...................................................................................17

Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,
    547 U.S. 47 (2006)...................................................................................11, 14

Sorrell v. IMS Health Inc.,
    564 U.S. 552 (2011)................................................................................. 12, 13-14

Spokeo, Inc. v. Robins,
    578 U.S. 330 (2016)...................................................................................20

Texas v. Johnson,
    491 U.S. 397 (1989)...................................................................................11, 12

Uzuegbunam v. Preczewski,
    141 S. Ct. 792 (2021)...................................................................................20

Ward v. Rock Against Racism,
    491 U.S. 781 (1989)...................................................................................14

Winter v. Nat. Res. Def. Council, Inc.,
    555 U.S. 7 (2008)...................................................................................8, 22

Young v. Amer. Mini Theaters,
    427 U.S. 50 (1976)...................................................................................11

**Other Authorities**

U.S. Const. amend. XIV, § 1 ...................................................................................17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

THE CLEMENTINE COMPANY LLC, d/b/a THE
THEATER CENTER, WEST END ARTISTS COMPANY
d/b/a THE ACTORS TEMPLE THEATRE, SOHO
PLAYHOUSE, INC., d/b/a SOHO PLAYHOUSE INC.
d/b/a SOHO PLAYHOUSE, CARAL LTD. d/b/a
BROADWAY COMEDY CLUB,                                    21-CV-7779 (CM)

                                        Plaintiffs,

                    -against-

BILL de BLASIO, in his official capacity as Mayor of New
York City,

                                        Defendant.
------------------------------------------------------------------------ x

### DEFENDANT MAYOR BILL DE BLASIO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Defendant Mayor Bill De Blasio ("Mayor de Blasio"), by his attorney Georgia M.

Pestana, Corporation Counsel of the City of New York, respectfully submits this memorandum

of law in opposition to Plaintiffs' motion for a preliminary injunction.

Plaintiffs ask this Court to grant the drastic remedy of a Preliminary Injunction

preventing defendant from enforcing the Mayoral Emergency Executive Orders setting forth the

regulation known as "Key to NYC".[1]  See Memorandum of Law in Support of Plaintiffs'

Motion for a Preliminary Injunction ("Pl. Mem.") at pp. 1-3.  Key to NYC requires patrons and

---

[1] Key to NYC was first published as part of Mayoral Emergency Executive Order ("EEO") 225 on August 16, 2021.  It has been extended every five days, with slight modifications in EEO 226, EEO 228, EEO 239, and EEO 250.  The current text of Key to NYC is set forth in EEO 250, dated September 24, 2021, annexed to the Lulich Decl. at Exhibit A.  EEO 250 was extended without alteration by EEO 254 on September 29, 2021, and most recently by EEO 254 on October 4, 2021.

employees of businesses that provide purely recreational activities to be vaccinated prior to entering inside of such businesses.  Plaintiffs assert that Key to NYC violates their First Amendment rights to freedom of speech and denies Plaintiffs of equal protection of the laws as guaranteed by the Fourteenth Amendment.  Plaintiffs cannot demonstrate that they are entitled to a preliminary injunction, and their motion must be denied in its entirety.

Plaintiffs' allegations are contrary to the facts and prevailing law.  First, Key to NYC does not violate Plaintiffs' First Amendment rights because Key to NYC does not regulate or interfere with Plaintiffs' expression, and, therefore, the First Amendment is not implicated. However, even if this court found that Key to NYC regulates expression, it is content-neutral and easily survives intermediate scrutiny.  Second, Key to NYC does not violate plaintiffs' Equal Protection rights because under Key to NYC Plaintiffs are not treated differently than similarly situated businesses, and Key to NYC, which is intended to encourage vaccination to further reduce the spread of Covid-19, is rationally based on current scientific knowledge of COVID-19 and research that demonstrates what is most likely to increase vaccination rates among New York City residents, especially young adults.  Third, plaintiffs lack standing to bring these claims because they have not, and cannot, demonstrate injury-in-fact.  Plaintiffs cannot establish a likelihood of success on the merits.  Finally, even if plaintiffs could demonstrate any likelihood of success on the merits, they have failed to demonstrate irreparable harm, and the balancing of the equities and public interest weigh against their requested relief.  Accordingly, Plaintiffs' motion must be denied.

## STATEMENT OF FACTS

### The COVID-19 Public Health Crisis

Since March of 2020, New York City, along with the rest of the world, has been struggling with COVID-19, a new, potentially severe, and sometimes fatal, viral infection.  The

COVID-19 pandemic is unprecedented in its scope, affecting nearly every country in the world. Its devastating health outcomes, both direct and indirect, cause enormous public health concerns. See Affirmation of Dr. Jay Varma ("Varma Aff.") at ¶¶ 7-9. The virus that causes COVID-19 remains prevalent in United States and throughout the world, because there is no medication that can cure infection and the percentage of individuals who have been vaccinated globally and domestically is not sufficient to achieve high levels of population immunity. Id. at ¶ 13. Additionally, there are now mutations of the virus, such as the Delta variant, which are more contagious than the original strain. Id. at ¶ 14.

In response to the outbreak of COVID-19 in New York State, on March 7, 2020, Governor Cuomo declared a formal state of emergency in the State of New York ("State"). On March 12, 2020, Mayor de Blasio declared a state of emergency in New York City ("City"). Both the State and the City then implemented various orders aimed at preventing the spread of the COVID-19 virus. As the rates of transmission fell, and particularly since vaccination became widely accessible in New York in the spring of 2021, the State permitted non-essential in-person activities to resume with safety precautions.

However, while the City is no longer experiencing the widespread crisis that marked the spring of 2020, COVID-19 is still spreading throughout the United States in many affected geographic areas, including the New York metropolitan region. Varma Aff. at ¶¶ 16-18. The Centers for Disease Control and Prevention (CDC) reports that New York City is experiencing a high level of community transmission.[2] Over the last 28 days in New York City,

---

[2] CDC COVID Data Tracker, available at: https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Oct. 5, 2021).

there was an average of 1,224 confirmed new cases per day.[3]  Accordingly, New York City must remain cautious to protect New Yorkers who are most susceptible to severe COVID-19 illness and death, as well as to prevent additional increases in transmission rates and/or the evolution of new variants, and to prevent the hospital system from becoming overwhelmed as it was in the spring of 2020.  Varma Aff. at ¶ 19.

**<u>COVID-19 Vaccination</u>**

Widespread vaccination against COVID-19 will reduce the number of cases of COVID-19 and will reduce the number of severe illness and deaths. <u>Id.</u> at ¶¶ 22-24, & 26. 23. Overwhelmingly, COVID-19 illness, hospitalizations, and deaths are among people who are not fully vaccinated.  <u>Id.</u> at ¶ 23.  Since January 17, 2021, when the first vaccinations in New York City started offering protection, unvaccinated persons accounted for approximately 94% of COVID-19 cases, 96% of hospitalizations, and 97% of deaths.  <u>Id.</u> at ¶ 24.  A population that is 100% vaccinated will be protected against outbreaks and surges in hospitalizations; however, the exact level below 100% that is sufficient for such protection is unknown.  <u>Id.</u> at ¶ 26.  This threshold (known as the "population immunity" or "herd immunity" threshold) goes up the more infectious the virus is; with the Delta variant, it is likely that the threshold is greater than 90%, but further research and observation is needed before the exact level can be known.  <u>Id.</u>

Additionally, COVID-19, like all viruses, mutates because of errors in the process of replicating its genetic code. <u>Id.</u> at ¶ 14.  Some mutations can change the characteristics of a virus including its contagiousness (how easily one person spreads infection to another person), its immune evasion (how much it is able to infect people who have some immunity from prior

---

[3] <u>See</u> New York City Department of Health and Mental Hygiene ("DOHMH"), COVID-19 Data, Latest Data, available at: https://www1.nyc.gov/site/doh/covid/covid-19-data.page (last visited Oct. 5, 2021).

infection or vaccination), and its virulence (how severe of an illness it causes).  Id. at ¶¶ 14-15.

Notably, almost all New York City cases are now primarily of the Delta variant, which is 2 to 3

times more contagious than the original strain.  Id. at ¶ 14.  Widespread vaccination would also

delay, or possibly prevent, the emergence of more dangerous variants, because the fewer people

who are infected, the fewer opportunities there are for the virus to mutate and spread.  Id. ¶ 15, &

26-27.

Further, vaccination benefits both vaccine recipients and those with whom they

come into contact, including individuals who are ineligible for the vaccine.  Id. at ¶ 27.  A

vaccinated person has a lower risk of acquiring infection than an unvaccinated person, and,

therefore, a vaccinated person is at substantially lower risk of spreading infection to household

members and the community.  Id.  If a vaccinated person is infected, even with the Delta variant,

emerging evidence indicates that they are less likely to infect other people, because they are

infectious to others for fewer days than an unvaccinated person.  Id.  The benefit of having a

fully vaccinated population is that risk is exponentially reduced.  Id.  The risk of transmitting

COVID-19 indoors is the risk that person A is infected and contagious with COVID-19

multiplied by the risk of person B being infected if they are exposed to the first person.  Id.

Vaccination reduces both the probability that person A entering the indoor facility is infectious to

others and the probability that exposure to COVID-19 will lead to persons B and other persons

C, D, E, etc. being infected.  Id.

The total vaccination rate among City residents is 63.9%, with an additional 7%

having received one dose.[4] The vaccination rates have increased since the Key to NYC went into

effect.  On August 16, 2021, the date the challenged EEO was signed, 58.5% of City residents

---

[4] DOHMH, COVID-19 Data, Vaccines, available at: https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page (last visited Oct. 5, 2021)

were fully vaccinated, with an additional 6.6% having received one dose.  Id.  Of note, vaccination rates are lower among young adults.[5]   According to the CDC, adults aged 18-24 were least likely to have received a COVID-19 vaccination.  Id.  Similarly, DOHMH data shows that, for City residents, individuals aged 18-34 years have the lowest vaccination rate of those eligible under the age of 85.[6]   Currently, 81% of individuals aged 18-24 in the City have received at least one dose, and 77% of 25-34 year olds have received one dose.  Id.  These vaccination rates are up 11% and 7%, respectively, since the Key to NYC was issued.  Id.  However, the current total vaccination rates remain below the threshold (likely over 90% of the population being fully vaccinated) necessary to protect against outbreaks and surges in hospitalizations.  Varma Aff. at ¶ 26.

## Key to NYC

Key to NYC applies to "covered entities", defined as "any entity that operates one or more covered premises, except… pre-kindergarten through grade twelve (12) public and non-public schools and programs, houses of worship, childcare programs, senior centers, community centers…" See EEO 250 § 2.f(2).  "Covered premises" are indoor food services, indoor gyms and fitness settings, id. at § 2.f(3)(ii) & (iii), and, most relevant here:

> **Indoor Entertainment and Recreational Settings, and Certain Event and Meeting Spaces** including indoor portions of the following locations, regardless of the activity at such locations: movie theaters, music or concert venues, adult entertainment, casinos, botanical gardens, commercial event and party venues, museums, aquariums, zoos, professional sports areas and indoor stadiums

---

[5] See Brittney N. Baack, COVID-19 Vaccination Coverage and Intent Among Adults Aged 18–39 Years — United States, March–May 2021, 70 MORBIDITY AND MORTALITY WEEKLY REPORT 928 (2021), available at: cdc.gov/mmwr/volumes/70/wr/pdfs/mm7025e2-H.pdf (last visited August 22, 2021).

[6] See DOHMH COVID-19 Data.

> convention centers and exhibition halls, hotel meeting and
> event spaces, performing arts theaters, bowling alleys,
> arcades, indoor play areas, pool and billiard halls, and other
> recreational game centers[.]

Id. at § 2.f(3)(i) (emphasis in original).  Key to NYC directs covered entities to ensure that

patrons over the age of twelve, employees, interns, volunteers and contractors entering their

premises have at least one dose of a COVID-19 vaccination authorized for emergency use by the

CDC or World Health Organization ("WHO").  Id. at §§ 2.b & 2.f(8).  In order to comply,

covered entities are directed to require proof of vaccination and identification upon entry.  Id. at

§ 2.b.  Key to NYC is enforced as designated by the Commissioner of the Department of Health

and Mental Hygiene.  Id. at § 2.i.  Violations carry a penalty of $1,000, increasing to $2,000 for

repeat violations.  Id. at § 2.j.  The New York City Commission on Human Rights[7] ("CHR") and

DOHMH[8] are directed to publish guidance on the implementation of the EEO.  Id. at §§ 2.h &

2.k.

      The purpose of Key to NYC is to increase the number of vaccinated individuals in

New York City because vaccination is identified by public health experts as the most effective

tool to mitigate the spread of COVID-19 and protect against severe illness.  See EEO 250 (citing

EEO 228, annexed to the Lulich Decl. as Exhibit B); see also Varma Aff. at ¶¶ 6 & 34-42.  The

regulation directly furthers this public health goal, particularly among those who are most likely

to frequent such establishments while at the same time being the most likely to have not already

been vaccinated.  Id.  Adults aged 18-34 have the lowest vaccination rate of those eligible, except

people over 85 years of age.  See id., Baack, supra; see also DOHMH COVID-19 Data.  Prior to

---

[7]        The     CHR     Guidance     is     available     at:
https://www1.nyc.gov/assets/cchr/downloads/pdf/KeyToNYC_FactSheetBusiness-English.pdf
(last visited Oct. 4, 2021).
[8] DOHMH maintains numerous guidance and informational documents, available at:
https://www1.nyc.gov/site/doh/covid/covid-19-vaccines-keytonyc.page (last visited Oct. 4, 021).

instituting Key to NYC, New York City conducted research into motivators for vaccination.[9]  Id.
The results indicate that for 55% of City residents, being able to go out to restaurants, the gym,
and return to normal activities would make them more likely to get vaccinated.  Among those
people who were hesitant to get vaccinated, 20.8% said the ability to resume normal activities
would motivate them to get vaccinated. See Baack, supra.  Additionally, a recent CDC study
showing that the prime motivators for getting vaccinated among adults aged 18-39 years are a
desire to protect others and a desire to resume social activities.  Id.

## STANDARD OF REVIEW

In order to prevail on a motion for a preliminary injunction, plaintiffs must
demonstrate that they are likely to succeed on the merits of their claims, are likely to suffer
irreparable harm without preliminary injunctive relief, that the balance of equities tips in their
favor, and that an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555
U.S. 7, 20 (2008); Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir.
2011).  At an absolute minimum, plaintiffs must demonstrate "that serious questions going to the
merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  Cottrell,
632 F.3d at 1134-35. In any event, injunctive relief "is 'an extraordinary and drastic remedy, one
that should not be granted unless the movant, by a clear showing, carries the burden of
persuasion.'" Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

---

[9] See Global Strategy Group, May Coronavirus Poll Findings, annexed to the Varma Aff. as Ex.
A.

## ARGUMENT

### POINT I

### PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' request for a preliminary injunction must be denied because they cannot demonstrate a likelihood of success on the merits.  The Key to NYC does not violate plaintiffs' First Amendment rights or their Equal Protection rights, and plaintiffs lack standing to bring the claims.

**A.** **Key to NYC Should be Upheld Under Jacobson**

Despite Plaintiffs' effort to misconstrue, recent Supreme Court decisions do not require this Court to ignore Jacobson v. Massachusetts, 197 U.S. 11, 31 (1905), which remains precedential. See, e.g, Butler v City of NY, 2021 US Dist LEXIS 170311, at *14-15 (SDNY Sep. 8, 2021) ("whatever doubts Roman Catholic Diocese and Agudath may raise about Jacobson's continuing viability, those cases dealt only with a free exercise claim, and did not explicitly overrule Jacobson.") (citations omitted); see also Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other lines of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Indeed, the instant facts and circumstances mirror those in Jacobson, an Equal Protection challenge to a regulation requiring vaccinations within the limits of Cambridge, Massachusetts, with the alleged injury of financial damages.  Id. at 31.  Therefore, Key to NYC should be reviewed under the standard set forth in Jacobson.

In Jacobson, the Supreme Court acknowledged that "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the

governing authority of the country essential to the safety, health, peace, good order, and morals of the community." <u>Jacobson</u>, 197 U.S. at 26. The <u>Jacobson</u> Court set forth a deferential standard when reviewing a statute "purporting to have been enacted to protect the public health, the public morals or the public safety," but which allegedly violates a fundamental right. <u>Jacobson</u>, 197 U.S. at 31. Such a statute must not be disturbed unless it "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law..." <u>Id</u>. In other words, "this review [is] asking whether power had been exercised in an 'arbitrary, unreasonable manner,'" <u>In Re Abbott</u>, 954 F. 3d 772, 784 (5th Cir Apr. 7, 2020) (<u>quoting</u> <u>Jacobson</u> at 28, 38).

Key to NYC is not arbitrary, unreasonable, or oppressive and bears a substantial relation to public health and safety. Key to NYC was implemented to prevent the spread of COVID-19 by encouraging widespread vaccination immunity among New York City residents to avoid the myriad damages caused by the virus to individuals and businesses. <u>See</u> Varma Aff. at ¶¶ 38-42. This is especially true considering the recent uptick in COVID-19 cases throughout the City and country. <u>Id</u> at ¶ 18. The City's requirement that employees and patrons of indoor dining, entertainment venues, or fitness centers show proof of vaccination is intended to increase vaccination rates thereby ensuring widespread immunity to the virus through vaccination, and, over time, preventing transmission in non-essential and higher-risk locations. Varma Aff. at ¶ 38. The evidence suggests that most adults would choose to get vaccinated if it were required for dining and/or entertainment. <u>Id.</u> at ¶ 29. Because Key to NYC is not arbitrary, unreasonable, or oppressive and bears a substantial relation to public health and safety it should be upheld under the <u>Jacobson</u> standard.

**B.      Plaintiffs Are Not Likely to Succeed on their First Amendment Claim**

          Even if Jacobson does not apply, plaintiffs' First Amendment claim fails under the traditional analysis.  The First Amendment guarantee of freedom of expression includes the right to express an idea, the right to refrain from speaking, and the right to be free from government-compelled speech.  See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 213 (2013); Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 61 (2006); Texas v. Johnson, 491 U.S. 397, 414 (1989).  "The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression."  Young v. Amer. Mini Theaters, 427 U.S. 50, 78 (1976) (Powell, J., concurring). Where a law "target[s] speech based on its communicative content," it may only survive if it meets the strict scrutiny standard. Nat'l Institute of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371 (2018);  Reed v. Town of Gilbert, 576 U.S 155 (2015).  On the other hand, where a law is content-neutral, the court applies intermediate scrutiny.  See, e.g., Rumsfeld, 547 U.S. at 62.  Regulations survive intermediate scrutiny if they "are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alterative channels for communication of that information." Mastrovincenzo v. City of New York, 435 F.3d 78, 98 (2d Cir 2006) (quoting Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005)).  Plaintiffs' freedom of expression claim fails because Key to NYC does not regulate or interfere with plaintiffs' expression, and, therefore, the First Amendment is not implicated.  However, even if this court found that Key to NYC regulates expression, it is content-neutral and easily survives intermediate scrutiny.

1.      **The Key to NYC Does Not Regulate Speech or Expression**

The Key to NYC does not prevent plaintiffs from engaging in expressive activity, and does not regulate the expressive activity in which plaintiffs engage. Rather, it prevents entertainment venues from admitting ticket-holders who have not received at least one dose of the COVID-19 vaccine into indoor, in-person events. See EEO 250, Lulich Decl., Ex. A. Key to NYC regulates patrons' admission into the venue on the basis of vaccination status, not plaintiffs' expression or performance. Id. Plaintiffs do not allege that the Key to NYC has changed their programming, expression, or performances in any way. Indeed, plaintiffs have set forth no evidence regarding any alleged impact of Key to NYC on Soho Playhouse, the Actors Temple Theater, or Broadway Comedy Club. Rather, plaintiff Clementine Company, through its owner Catherine Russell, complains that it must turn away an undefined number of individuals seeking tickets to performances because they are not vaccinated. See Russell Decl., at ¶¶ 27-29, 33, & 41. However, there is no legal support for the contention that *plaintiffs*' First Amendment rights are violated because some potential audience members cannot attend an indoor, in-person performance.

Rather, plaintiff Clementine Company complains that its conduct, admitting or denying entry to a prospective audience member, is implicated by the Key to NYC. Conduct can be expressive, and subject to First Amendment protections, when the speaker intends to "convey a particularized message" and it is likely that message would be understood by those to whom it was conveyed. Johnson, 491 U.S. at 404; see also Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004). However, regulations directed at non-expressive conduct do not implicate the First Amendment if they impose, at most, "incidental burdens on speech." See Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011) ("[T]he First Amendment

does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). Theaters and comedy clubs turn away potential audience members for many non-expressive reasons, for example an inability to pay for a ticket, behaving disruptively, arriving too late to be quietly seated, or, for comedy clubs where alcohol is sold, being under the age of 21. Plaintiff Clementine Company alleges that it requires all audience members to wear masks, a policy that may discourage or prevent certain potential audience members from attending a performance. Nothing about these administrative and commercial decisions regarding admission and conduct of the audience is meant to be, or perceived as, expressive. The admission of an individual into a venue merely because the individual purchased a ticket to a performance is not protected expressive conduct on the part of the venue. See New York City C.L.A.S.H. v. City of New York, 315 F. Supp. 2d 461 (S.D.N.Y. April 7, 2004) (upholding a ban on smoking in certain locations because, while it is conceivable that someone would smoke for the purpose of sending a message, the relevant focus is "the smoker's prevailing motivation for smoking a cigarette… in smoking, like many other commonplace acts, the non-expressive purpose subsumes whatever expressive message may be inferred."). Similarly, plaintiffs have not alleged, and there is no evidence in the record to support, that plaintiffs admittance of ticket-holders into the venue is intended to "convey a particularized message." C.L.A.S.H., 315 F. Supp. 2d at 40 ("Courts that have found protectable expression in conduct have done so because the expressive component was the primary, if not the sole, purpose of the act"). Rather, the admission of a patron because that patron bought a ticket to an event is conduct done for commercial reasons. Regulations directed at non-expressive conduct do not implicate the First Amendment because they impose, at most, "incidental burdens on speech." Sorrell, 564 U.S. at

-13-

567.  As Key to NYC regulates only non-expressive conduct, plaintiffs' First Amendment claim

must fail. Rumsfeld, 547 U.S. at 60.

    **2.    Key to NYC Is Content-Neutral**

            Even if the conduct regulated by Key to NYC were expressive, Key to NYC is

content-neutral and would easily survive intermediate scrutiny. A content-based regulation

"target[s] speech based on its communicative content." Nat'l Institute of Family & Life

Advocates, 138 S.Ct. at 2371 (quoting Reed, 576 U.S. at 163). "In the analysis of whether a

regulation is content-based or content-neutral, the 'principal inquiry…, in speech cases

generally… is whether the government has adopted a regulation of speech because of

disagreement with the message it conveys.'" Hobbs, 397 F.3d at 149 (quoting Ward v. Rock

Against Racism, 491 U.S. 781, 791 (1989)). A regulation "is content neutral so long as it is

justified without reference to the content of the regulated speech." Id. (quoting Ward, 491 U.S. at

791) (internal quotations omitted). It is well-settled that "[a] regulation that serves purposes

unrelated to the content of expression is deemed neutral, even if it has an incidental effect on

some speakers or messages but not others." Christian Legal Soc'y Chapter of the Univ. of Cal. v.

Martinez, 561 U.S. 661, 696 (2010) (quoting Ward, 491 U.S. at 791).

            Key to NYC is content-neutral on its face.  It applies to indoor entertainment

venues, some of which are involved in expression and some of which are not.  It does not target

any particular type of expression, any particular speaker, nor any particular subject-matter.

Unlike the cases cited by plaintiffs, Key to NYC does not prevent nor exclude, nor specially

permit, any particular type of expression. See Reed, 576 U.S. at 168-70 (finding a sign regulation

violated the first amendment because it treated certain signs more or less favorably based on

content); Barr v. Am. Ass'n of Political Consultants, 140 S. Ct. 2335, 2347 (2020) (finding a law

against robocalls except for collection of government debt was content-based because it "is directed at certain content and is aimed at particular speakers."); <u>Cincinnati v. Discovery Network</u>, 507 U.S. 410, 430 (1993) (holding the city could not prohibit distribution of "commercial handbills" while permitting distribution of newspapers and magazines); <u>Police Dep't of Chicago v. Mosley</u>, 408 U.S. 92, 92 (1972) (holding that regulation preventing all picketing except labor picketing was content-based). Key to NYC has no bearing on plaintiffs' expression or the type or content of their performance.

Plaintiffs' argument that the language of Key to NYC provides an exception to houses of worship, schools, and community centers rendering the regulation content-based fares no better. First, there is no indication that houses of worship, schools, or community centers are even holding theatrical or comedy performances that are treated more favorably than plaintiffs. Further, that Key to NYC regulates conduct, and not expression, is exemplified by the exclusion of houses of worship, schools and community centers. To the extent houses of worship and theaters may sometimes use the same space, or that educational organizations may use art and performance as part of their curriculum, does not mean that this regulation requiring entertainment venues admit only vaccinated individuals is content-based. These entities do not have "patrons" and do not exist for the purpose of entertainment, rather, they serve specific populations for the purpose of education, social service provision, and/or leading a community in religious worship. In any event, these entities are subject to other regulations based upon their purposes and the populations they serve, and, as described more fully in Point I.B, <u>supra</u>, they are not similarly-situated to plaintiffs.

### 3.      Key to NYC Survives Intermediate Scrutiny

When a regulation is content-neutral, the Court applies intermediate scrutiny. Mastrovincenzo, 435 F.3d at 98.  Regulations survive that scrutiny when they "are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alterative channels for communication of that information." Id. (quoting Hobbs, 397 F.3d at 149). Under this standard, the government does not need to use "the least intrusive means" and the regulation survives scrutiny "so long as the… [content-neutral] regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. Key to NYC is rationally related to the protection of legitimate government interests, i.e., incentivizing more individuals to be vaccinated, ensuring widespread vaccination against COVID-19 in order to prevent its transmission and mutation to more virulent forms, avoid mass hospitalizations, illness, long-term disability and death, and avoid further economic damage occasioned by additional outbreaks.  See EEO 250, Lulich Decl., Ex. A; EEO 228, Lulich Decl., Ex. B; Varma Aff. at ¶¶ 34 – 44.

Further, Key to NYC is narrowly-tailored.  It applies to entertainment activities of all kinds, does not apply to businesses or entities needed for essential daily living, and does not interfere with education, social service provision, or religious worship.  Further, it permits entertainment activities to remain open and does not interfere with venues' expression of their chosen message.  The regulation recognizes that people, and in particular young adults, report they would be motivated to become vaccinated in order to return to restaurants, gyms, and "normal life."  Therefore, Key to NYC addresses these legitimate government interests in a manner that was tailored to the goal of increased vaccination rates. Plaintiffs' ability to engage in their chosen expression to an audience remains intact, and "the First Amendment does not

guarantee the right to communicate one's views at all times and places and in any manner that may be desired." Mastrovincenzo, 435 F.3d at 98. As Key to NYC addresses legitimate government interests which would be achieved less effectively in the absence of the law, and leaves open plaintiffs' ability to engage in expression through performances of their choice, it passes intermediate scrutiny. Id. Because Key to NYC regulates conduct and not expression, is content-neutral, and passes intermediate scrutiny, plaintiffs' First Amendment free expression claim fails.

### C.   Plaintiffs Are Not Likely to Succeed on their Equal Protection Claim

Similarly, plaintiffs' Equal Protection claim fails under the traditional analysis. The Equal Protection Clause of the Fourteenth Amendment directs that "no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'" U.S. Const. amend. XIV, § 1; City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). If a law neither burdens a fundamental right nor targets a suspect class, the court must uphold it if it bears a rational relation to a legitimate end. See, e.g., Romer v. Evans, 517 U.S. 620, 631, (1996) (citing Heller v. Doe, 509 U.S. 312, 319-320 (1993)). Equal protection requires the government to treat all similarly situated persons alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). It prohibits the government from drawing "distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." Lehr v. Robertson, 463 U.S. 248, 265 (1983). Not all legislative classifications, however, violate equal protection. See Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). The "promise [of] equal protection of the laws must coexist with the practical necessity that most legislation  classifies for one purpose or another, with resulting disadvantage to various groups or persons." Romer, 517 U.S. at 631. "The general rule is that legislation is presumed

to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne, 473 U.S. 432 at 440.

Key to NYC is rationally related to a legitimate interest.  As explained in the Varma Aff., the purpose of Key to NYC is widespread vaccination, and the evidence suggests that most adults would choose to get vaccinated if it were required for dining and/or entertainment.  Id. at ¶ 29.  Since adults ages 18-34 most frequently patronize restaurants and other entertainment venues and also have the lowest reported rate of vaccination, the requirements set forth in Key to NYC are reasonably related to the goal of increasing vaccination rates among New York City residents. Varma Aff. at ¶¶ 26 & 30.

Plaintiffs seem to be alleging that because activities held in churches, schools, and community centers present risks of COVID-19 transmission, that it is not rational for Key to NYC to apply to Plaintiffs. Pl. Mem. at pp. 21-22.  Significantly, Plaintiffs' arguments ignore the fact that the goal of Key to NYC is to increase vaccination rates among City residents, especially young adults, by requiring vaccination for participation in and employment in recreational activities in the City, and therefore plaintiffs' comparisons of the relative immediate safety of theater performances versus religious, school, or community center activities misses the mark[10].

---

[10] Even if schools could be construed as similarly situated to plaintiffs, City schools are already subject to vaccination mandates for employees and visitors over the age of 12.  Notably, contrary to plaintiffs' contention that "parents without proof of vaccination are allowed to attend an elementary school production of Lion King, Jr., but those same individuals are barred from attending The Lion King on Broadway," (Pl. Mem. at pp. 17-18), any visitor to a City public school must be vaccinated if over the age of 12, and, in order to participate in extracurricular activities such as theater, students who are over the age of 12 must be vaccinated.  See New York City Department of Education Health and Safety in Our Schools, available at: https://www.schools.nyc.gov/school-life/health-and-wellness/covid-information/health-and-safety-in-our-schools (last visited Oct. 5, 2021).  Moreover, there is no evidence that community centers in the City are currently engaged in theatrical productions nor that they are admitting unvaccinated members of the public to see such productions.  By contrast, many community

Further, the City considered the evidence in issuing the challenged EEO.  Research indicates that requiring vaccination for participation in entertainment activities would accomplish this goal. Varma Aff. at ¶¶ 26-30.   Research conducted in prior to implementing Key to NYC demonstrated that a majority of respondents would be motivated if vaccination were required to go to restaurants and gyms and otherwise return to normal activities. Varma Aff. at ¶¶ 27-29.  It was entirely reasonable and rational for policymakers, such as the Mayor, to determine that City residents should be able to patronize establishments that provide religious, education, and social services, and essential services, without mandating vaccinations while also implementing a program designed to increase vaccination rates by requiring vaccination to engage in entertainment activities.

Plaintiffs also incorrectly assert that strict scrutiny applies to their Equal Protection claim because Key to NYC impinges upon their First Amendment rights.  Pl. Mem. at pp. 19-20.   While true that "[c]lassifications affecting fundamental rights . . . must survive heightened scrutiny," Gen. Media Communs. v Cohen, 1997 U.S. No. 97-6092 App. LEXIS 40571,*37-38 (2d Cir. 1997) (citations omitted), here, as set forth in Point I.A, supra, Key to NYC does not implicate plaintiffs' First Amendment rights because it does not regulate expression, or affect plaintiffs' expression in any way.[11]  Nor does Key to NYC impinge upon any other fundamental right. See McDonald v. City of Chicago, 561 U.S. 764 (2010) ("A right is

---

centers, such as senior centers, offer essential social services such as meals, connection to health care, and even COVID-19 vaccinations.  See, e.g., New York City Department of the Aging, Senior Centers, available at: https://www1.nyc.gov/site/dfta/services/senior-centers.page (last visited Oct. 5, 2021).

[11] To the extent that Plaintiffs try to construe any decisions in Clementine Co., et al. v. Cuomo, No. 1:20-cv-08899-CM ("Clementine 1") (see Pl. mem. At pp. 19, 22), such references should be disregarded as Clementine 1 involves a challenge to a completely different Executive Order which was issued by the State and is inapplicable to the instant action.

deemed fundamental when the Supreme Court determines that 'a particular Bill of Rights guarantee is fundamental to our scheme of ordered liberty and system of justice.'") (internal citations omitted); Clark v. Jeter, 486 U.S. 456, 461 (1988). Plaintiffs do not have a constitutional right to do business without any conditions. See, e.g., New Motor Vehicle Bd. Of California v. Orrin W. Fox Co., 439 U.S. 96, 106 (1978); Columbus Ale House v. Cuomo, 495 F. Supp. 3d 88, *92-92 (E.D.N.Y. Oct. 16, 2020). Thus, because plaintiffs' fundamental rights are not burdened, strict scrutiny does not apply. See, e.g., Clark, 486 U.S. at 461. As a result, because plaintiffs have not met their burden of showing that Key to NYC is without a rational basis, plaintiffs' Equal Protection claim fails.

**D.      Plaintiffs Lack Standing**

Plaintiffs have not suffered, and are not likely to suffer, any injury-in-fact. To establish Article III standing, a plaintiff must show that it has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992); see also Uzuegbunam v. Preczewski, 141 S. Ct. 792, 797 (2021); Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The injury in fact must be "concrete and particularized," and "actual or imminent." See, e.g., Lujan, 504 U.S. at 560. A "conjectural or hypothetical" injury is not sufficient, nor is a "grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law." Carney v. Adams, 141 S. Ct. 493, 498 (2020) (citing Lujan, 504 U.S. at 561; Hollingsworth v. Perry, 570 U.S. 693, 706 (2013)). The burden of proving each element of standing rests on the Plaintiffs. Lujan, 504 U.S. at 561; Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U. S. 167, 191 (2000).

In particular, both Soho Playhouse[12] and the Actors Temple Theatre[13] advertise themselves as requiring full vaccination of all patrons, a policy that goes above and beyond what is required by the challenged EEO.  Full vaccination requires that the patron have received both doses of the Pfizer or Moderna vaccine, or one dose of the Johnson & Johnson vaccine, and then waited two weeks to be considered at full immunity. See, e.g., Soho Playhouse Website.  The challenged EEO requires only one dose of any of the three vaccines, with no waiting period.  See EEO 250, Lulich Decl., Ex. A.  In addition, these venues have required full vaccination since at least July of 2021, well before Key to NYC was issued.[14]  In addition, while plaintiffs make much of the idea that attendees of religious services do not fall under the Key to NYC even if they take place in a theater building, individuals attending religious services at Actors Temple are also required to be fully vaccinated.[15]  As Soho Playhouse and Actors Temple have been implementing a more strenuous version of the challenged regulation voluntarily, they can demonstrate no injury-in-fact as a result of the Key to NYC program, and there is no credible threat of enforcement. See, e.g., Driehaus, 573 U.S. at 159-60.

Further, plaintiffs have proffered no admissible evidence regarding the practices or alleged injuries of any plaintiff other than Clementine Company via Ms. Russell's Affidavit. It is unclear whether the Broadway Comedy Club also required patrons to be vaccinated prior to

---

[12] Soho Playhouse Website, available at https://www.sohoplayhouse.com (last visited Oct. 4, 2021); see also Soho Playhouse Tweet, annexed to the Lulich Decl. as Exhibit C.

[13] Actors Temple Theatre Website, available at: https://actorstempletheatre.com (last visited Oct. 4, 2021).

[14] Actors' Temple Congregation Ezrath Israel Membership Letter, High Holy Days, dated July 22, 2021, available at: https://drive.google.com/file/d/1EFRVcTLo3PK7TTzsv4YTwVfEs43Z-YxM/view (last visited Oct. 5, 2021); John Soltes, Review: "Haunt Quest" Starring Todd Robbins at SoHo Playhouse, Hollywood Soap Box, July 5, 2021, available at: www.hollywoodsoapbox.com/review-haunt-quest-starring-todd-robbins-at-soho-playhouse  (last visited Oct. 5, 2021);

[15] Actors Temple Website, available at http://www.theactorstemple.org/events (last visited Oct. 4, 2021).

the issuance of the challenged EEO, or how it purports to have been affected by the challenged EEO. In any event, even accepting Ms. Russell's statements that Clementine Company is required to turn prospective patrons away and hire additional employees for the theater's admission process, these allegations are insufficient to establish plaintiff Clementine Company's standing to bring the instant challenge. As described more fully in Points I.B, and I.C, supra, the Key to NYC does not regulate speech or expression, and therefore does not impinge upon plaintiffs' fundamental rights. Plaintiffs have not alleged that their expression has been affected in any way by the EEO, and plaintiffs cannot demonstrate any injury under the First Amendment as a result. To the extent Ms. Russell describes turning away patrons who are not vaccinated and who cannot attend an indoor, in-person theater production as a result, plaintiffs, the owners of theaters and/or a comedy club, do not have standing to bring a claim on behalf of these alleged would-be patrons (assuming, arguendo, the potential patrons would have a cognizable cause of action).

## POINT II

### PLAINTIFFS CANNOT MEET ANY OF THE REMAINING REQUIREMENTS FOR ISSUANCE OF A PRELIMINARY INJUNCTION

Plaintiffs' request for a preliminary injunction fails for additional, independent reasons. To obtain this injunctive relief, plaintiffs must show that they will suffer irreparable harm, that the balance of equities weighs in their favor, and that a preliminary injunction is in the public interest. Winter, 555 U.S. at 20; Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) ("Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge."). Plaintiffs cannot make these showings.

As described above, plaintiffs have not identified irreparable harm as a result of the challenged EEO because there has been no burden on plaintiffs' expression.  Plaintiffs Actors Temple Theatre (and the Actors Temple religious services) and Soho Playhouse have voluntarily implemented a more strenuous vaccination requirement for their venues, contradicting any assertion that Key to NYC affects them in any way.  There is no evidence whatsoever regarding Broadway Comedy Club, let alone evidence that demonstrates an irreparable injury that necessitates a preliminary injunction.  Finally, the description of the impact of the EEO on the Clementine Company does not constitute cognizable harm.  Ms. Russell appears to allege that the Key to NYC vaccination requirement creates an appearance that theaters are more dangerous than other places.  There is no support for this assertion. Notably, Key to NYC applies to a broad variety of entertainment venues, including restaurants, movie theaters, museums, casinos, botanical gardens, etc., as well as gyms and fitness facilities.  That a requirement mandating one dose of a vaccination to attend essentially any entertainment venue in the City would somehow prejudice the public toward theaters is a puzzling assertion.  Further, Clementine Company describes extensive safety measures taken at its theaters, including mandatory masking, social distancing and extra spacing between performers and the audience, etc.  It is unclear why the general public would interpret a one-dose vaccination requirement, applicable to many types of businesses in the City, as conveying a sense of danger around theaters, while plaintiffs engage in arguably more observable and voluntary safety measures at each performance. Finally, Ms. Russell describes having to turn away an unidentified number of patrons and hire an unidentified number of new employees. [16] At most, this represents financial loss, which is not irreparable as a matter of law.

_____

[16] Notably, Ms. Russell also reports that she voluntarily hired additional employees to enforce

As Plaintiffs have acknowledged, the City has a compelling interest in protecting the public health and preventing the spread of infectious disease.  Pl. Mem. p. 20.  Given the City's paramount interest in protecting the public health, and the City's interest in avoiding further closures of businesses, the requested injunction is not in the public interest.  Key to NYC was put in place to incentivize vaccination with the long term goal of stopping the spread of a deadly virus.  As things stand, the vaccinated public can go back to enjoying activities that were previously put on hold when COVID-19 infection rates were soaring, and can do so with the added peace of mind that covered businesses are taking the necessary steps to ensure their patrons are safe.  An injunction curtailing its enforcement is clearly not in the public interest.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant Mayor Bill de Blasio respectfully requests that this Court deny plaintiffs' motion for a preliminary injunction in its entirety, together with such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            October 8, 2021

                        Georgia M. Pestana
                        Corporation Counsel
                          of the City of New York
                        *Attorney for Defendant Bill de Blasio*
                        100 Church Street
                        New York, New York 10007
                        (212) 356-2369

                        By:_____/S/_____
                              Aimee K. Lulich
                              Assistant Corporation Counsel

Scali Riggs, Assistant Corporation Counsel
On the Memorandum

---

her mask requirement.  It is unclear why the same employees could not assist with admissions and monitor the audience during the performance for mask compliance.

21-CV-7779 (CM)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CLEMENTINE COMPANY LLC, d/b/a THE THEATER
CENTER, WEST END ARTISTS COMPANY d/b/a THE ACTORS
TEMPLE THEATRE, SOHO PLAYHOUSE, INC., d/b/a SOHO
PLAYHOUSE INC. d/b/a SOHO PLAYHOUSE, CARAL LTD. d/b/a
BROADWAY COMEDY CLUB,

Plaintiffs,

-against-

BILL de BLASIO, in his official capacity as Mayor of New York City,

Defendant.

## MEMORANDUM OF LAW BY DEFENDANT BILL DE BLASIO IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### *GEORGIA M. PESTANA*

*Corporation Counsel of the City of New York*
*Attorney for Defendant Mayor Bill de Blasio*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel: Aimee Lulich*
*On the Memorandum: Scali Riggs*
*Tel:  (212) 356-2369*
*Matter No.:*

*Due and timely service is hereby admitted.*

*New York, N.Y.  ......................................................................................, 2020......*

*....................................................................................................................... , Esq.*

*Attorney for ..................................................................................................................*