UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CLEMENTINE COMPANY, LLC, et al.,

Plaintiffs,

-against-

BILL DE BLASIO, in his official capacity as
Mayor of New York City,

Defendant.

No. 1:21-cv-07779-CM

**PLAINTIFFS' REPLY IN SUPPORT
OF MOTION FOR PRELIMINARY
INJUNCTION**

[Oral Argument Requested]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................ 1

   I.   Plaintiffs Are Likely to Prevail on the Merits ....................................... 3

     1.  Heightened Constitutional Scrutiny Applies ................................. 3

     2.  The Key to NYC Directly Burdens First Amendment Freedoms ................. 4

     3.  The Policy Is Content Based ................................................... 7

     4.  Strict Scrutiny Also Applies Under the Equal Protection Clause ................. 9

     5.  The Mandate Fails Strict Scrutiny ........................................... 9

  II.  The Other Preliminary Injunction Factors Also Support an Injunction ............ 13

 III.  Plaintiffs Have Standing ................................................................ 14

CERTIFICATE OF SERVICE ............................................................................ 17

# TABLE OF AUTHORITIES

## Cases

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020)........................................................................................4, 14

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
    140 S. Ct. 2335 (2020).................................................................................................7–8

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020) ........................................................................................13

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*,
    331 F.3d 342 (2d Cir. 2003)..........................................................................................13

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011).........................................................................................5, 10, 12

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988)........................................................................................................7

*Elrod v. Burns*,
    427 U.S. 347 (1976)......................................................................................................13

*Entm't Software Ass'n v. Foti*,
    451 F. Supp. 2d 823 (M.D. La. 2006).............................................................................5

*Entm't Software Ass'n v. Hatch*,
    443 F. Supp. 2d 1065 (D. Minn. 2006)...........................................................................5

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978)........................................................................................................8

*Fisher v. University of Texas*,
    570 U.S. 297 (2013)........................................................................................................9

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021)................................................................................................9–10

*Interstate Cir., Inc. v. City of Dallas*,
    390 U.S. 676 (1968)........................................................................................................5

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905).......................................................................................................3–4

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)........................................................................................................5

*McCullen v. Coakley*,
    573 U.S. 464 (2014)......................................................................................................13

*McCutcheon v. Fed. Election Comm'n,*
   572 U.S. 185 (2014)................................................................................................10

*N.Y. Progress & Prot. PAC v. Walsh,*
   733 F.3d 483 (2d Cir. 2013)....................................................................................14

*NAACP v. Button,*
   371 U.S. 415 (1963)..................................................................................................6

*Nixon v. Shrink Missouri Gov't PAC,*
   528 U.S. 377 (2000)................................................................................................13

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
   460 U.S. 37 (1983)..................................................................................................13

*Phillips v. City of New York,*
   775 F.3d 538 (2d Cir. 2015)......................................................................................9

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)...........................................................................................3, 7–8

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020)..............................................................................................3–4

*S. Bay United Pentecostal Church v. Newsom,*
   141 S. Ct. 716 (2021)................................................................................................4

*Schad v. Borough of Mount Ephraim,*
   452 U.S. 61 (1981)................................................................................................1–2

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021)..............................................................................................4

*Thomas v. Collins,*
   323 U.S. 516 (1945)..................................................................................................6

*Village of Schaumburg v. Citizens for a Better Env't,*
   444 U.S. 620 (1980)............................................................................................6, 15

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976)..............................................................................................5–6

*Virginia v. Am. Booksellers Ass'n, Inc.,*
   484 U.S. 383 (1988)................................................................................................15

## Other Authorities

Broadway League, *The Demographics of the Broadway Audience 2018-2019 SEASON* (Nov. 2019), https://www.broadwayleague.com/research/research-reports/ ...................................................................................................................11

NYC Comm'n on Human Rights, *Guidance for Businesses on Equitable Implementation of Key to NYC* (Sept. 8, 2021), https://www1.nyc.gov/assets/cchr/downloads/pdf/KeyToNYC_FactSheetBusiness-English.pdf..............................................................................................................8

NYC Dep't of Educ., Immunizations, https://www.schools.nyc.gov/school-life/health-and-wellness/immunizations (last visited Oct. 27, 2021)........................8

Phipps Houses, After School, https://www.phippsny.org/programs/education/after-school (last visited Oct. 27, 2021) ...................................................................................8

Press Release, Penn Medicine News, *Steep Decline in Organ Transplants Amid COVID-19 Outbreak* (May 12, 2020), https://www.pennmedicine.org/news/news-releases/2020/may/steep-decline-in-organ-transplants-amid-covid19-outbreak ...........................................................2

Scan Harbor, Our Programs, https://www.scan-harbor.org/our-programs/ (last visited Oct. 27, 2021).............................................................................................8

## INTRODUCTION

In his opposition to Plaintiffs' motion for preliminary injunction, Defendant Mayor de Blasio makes a fatal concession: He admits that the unequal restrictions imposed by the Key to NYC vaccine mandate are not justified based on public health concerns. Instead, the unequal treatment is supposedly justified based on his assessment of what types of speech are "purely recreational" and well-suited to incentivize or coerce individuals to be vaccinated. Opposition (Opp.) at 2. He casts off all pretense that public health concerns justify restricting unvaccinated individuals from attending shows in theaters and comedy clubs, but allowing them to attend religious services in those same spaces. He ignores the robust health and safety protections employed by Plaintiffs (e.g., requiring masking and installing advanced air filtration systems). Nor does he argue that theaters pose a unique risk not present in similar venues that are not subject to the same restrictions, like churches and community centers. Indeed, Defendant goes so far as to assert that any argument about "the relative immediate safety of theater performances … misses the mark." Opp. at 18. Instead, the goal of the Key to NYC—and the only justification offered by Defendant—is to leverage Plaintiffs' exercise of core First Amendment rights to encourage more members of an already highly vaccinated population to get partially vaccinated. This is an unprecedented weaponizing of the Constitution against the very rights it is intended to protect.

Theaters and comedy clubs,[1] are not and never have been "purely recreational." Instead, they are home to core First Amendment protected speech. *See, e.g.*, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; … live entertainment, such as musical and dramatic works fall within the First

---

[1] Although there are differences between live theater and live comedy, the same arguments largely apply to both. Accordingly, Plaintiffs will refer to both live theater and live comedy as theater unless there is specific need to refer to a distinctive aspect of live comedy.

Amendment guarantee."). Although theatrical performances can provide wonderful entertainment, they do not merely entertain. Instead—as they have throughout history—they instruct, educate, motivate, edify, and call to action. Theaters also provide a communal expressive experience which cannot be replicated anywhere else. In this way, attending the theater is akin to attending a worship service, though participants recite from the lectionary of Shakespeare or Miller rather than the Revised Common Lectionary or the Siddur. For these reasons, a restriction on who can attend the theater inflicts a First Amendment injury—both to theaters and their patrons.

What the Mayor has done is dictate that until individuals comply with his demand that everyone be vaccinated against COVID-19, they will be denied basic First Amendment freedoms. The Mayor argues that since those freedoms are attractive and desirable, he should be allowed to condition access to them in order to further his laudable goal of "increas[ing] the number of vaccinated individuals in New York City." Opp. at 7. This is an alarming rationale. What other First Amendment freedoms does the Mayor believe he can condition upon compliance with his policy preferences? For instance, increasing the number of organ donors would doubtless be a laudable or even compelling goal,[2] but could the Mayor declare that one needs to be show an organ donor card before attending a Church service or running for office? Surely not. First Amendment freedoms cannot to be used as a ransom to compel compliance with preferred social policies. They are basic and fundamental entitlements of human dignity, freedom, and flourishing—explicitly protected by constitutional guarantee.

Yet the Mayor selectively restricts certain First Amendment freedoms while allowing others based solely on the content of speech or the identity of the speaker. This is illustrated most

---

[2] Press Release, Penn Medicine News, *Steep Decline in Organ Transplants Amid COVID-19 Outbreak* (May 12, 2020), https://www.pennmedicine.org/news/news-releases/2020/may/steep-decline-in-organ-transplants-amid-covid19-outbreak.

clearly by the fact that on Sunday mornings, a Church service meets in the Orbach Theater and is allowed to welcome all to listen to a sermon and sing hymns. A few hours later, a matinee theatrical production in the *same space* must deny access to a sizable portion of those who want to listen to a musical—including even those who attended the church service but lack proof of vaccination. The only difference is the content of speech and whether it is secular or sacred.

These types of content-based restrictions are fundamentally suspect because they create the risk of government favoritism and the suppression of ideas. They are subject to the most searching type of constitutional scrutiny. The Supreme Court has recently clarified that this rigorous scrutiny applies even to pandemic-related restrictions that burden fundamental rights. The Mayor's executive order is so arbitrary and poorly tailored that it cannot survive either intermediate or strict scrutiny. And since it is always in the public interest to enjoin laws that violate the First Amendment, this Court should issue a preliminary injunction.

I.      **Plaintiffs Are Likely to Prevail on the Merits**

1.   **Heightened Constitutional Scrutiny Applies**

Because the Key to NYC burdens free speech rights in a content-based fashion, it is subject to strict scrutiny even though it concerns the COVID-19 pandemic. Under strict scrutiny a law must be narrowly tailored to further a compelling governmental interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015).

The Mayor argues that because he is regulating public health he is instead entitled to a deferential standard of review under *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). But the Supreme Court just last year rejected precisely this same argument when raised by the State of New York in seeking to justify COVID-related restrictions on religious worship. In *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), the Supreme Court did not apply deferential

review, but ordinary Free Exercise Clause principles—including strict scrutiny. There is no reason to think that other First Amendment freedoms are entitled to lesser protection during a pandemic than the free exercise of religion, and members of the Supreme Court clearly signaled that they should be treated the same. *Diocese*, 141 S. Ct. at 74 (Kavanaugh, J., concurring) (explaining that deference is not due to local authorities "when important questions of religious discrimination, racial discrimination*, free speech*, or the like are raised" (emphasis added)). Subsequent Supreme Court precedent regarding the COVID-19 pandemic reinforces this conclusion. *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (applying strict scrutiny to pandemic restrictions); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (same). And in the follow-up case to *Diocese*, the Second Circuit made clear that under *Jacobson*, "a state ... public-health measure 'must always yield in case of conflict with … any right which [the Constitution] gives or secures.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) (quoting *Jacobson*, 197 U.S. at 25). Plaintiffs are not asking the Court to apply a new standard that requires overturning or ignoring *Jacobson*.

The facts of this case are also starkly different from *Jacobson*. *Jacobson* involved a requirement that individuals either get vaccinated against smallpox or pay a five-dollar fine. *Jacobson*, 197 U.S. at 14. Individuals were not barred from participating in expressive or associative activities. And private businesses such as theaters were not required to exclude unvaccinated individuals. In contrast, the Key to NYC indefinitely bars individuals from participating in core First Amendment activities unless they get vaccinated and forces private businesses to enforce the Mayor's mandate or risk fines or even jail time.

### 2.   The Key to NYC Directly Burdens First Amendment Freedoms

The Mayor argues that the Key to NYC does not burden Plaintiffs' First Amendment freedoms because it merely limits who can attend a production rather than prohibiting or altering

the performances. Opp. at 12. This argument is contrary to common sense and decades of Supreme Court precedent. Limiting who can attend and listen to expressive conduct is an infringement of the First Amendment freedoms of both the "source" and the "recipients" of speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). Those who provide First Amendment-protected products and services are therefore able to challenge restrictions on who can purchase or patronize them.

One notable example was the successful challenge brought by the Entertainment Merchants Association, a group of software companies, against a California law that prohibited the sale or rental of violent video games to minors. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011). The law did not restrict what kinds of games the video game and software companies could create, it only prevented a certain subset of the population from accessing their speech. Yet not a single member of the Supreme Court, either in the majority or in dissent, questioned whether they could mount a First Amendment challenge.[3] This is substantially similar to the Key to NYC except that California's law allowed minors to buy the game with parental consent, while unvaccinated individuals in New York are categorically barred from attending the theater.

Many other decisions similarly allow purveyors of speech to challenge restrictions on who can access the speech. *See Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 685 (1968) (exhibitors of a film successfully challenged a law which barred them from allowing anyone under the age of 16 to attend); *Kleindienst v. Mandel*, 408 U.S. 753 (1972) (challenge by American scholars to the application of an immigration policy barring the admission of a certain scholar).

---

[3] Before the Supreme Court's decision in *Brown*, several other courts had enjoined similar restrictions, again without any questions regarding standing. *Entm't Software Ass'n v. Foti*, 451 F. Supp. 2d 823 (M.D. La. 2006); *Entm't Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065, 1068 (D. Minn. 2006), *aff'd sub nom. Entm't Software Ass'n v. Swanson*, 519 F.3d 768 (8th Cir. 2008).

*See also Virginia State Bd. of Pharmacy*, 425 U.S. 748 (collecting decisions on the reciprocal nature of First Amendment rights of speaker and listener).[4]

This makes perfect sense. First Amendment freedoms are communal and associational. *See NAACP v. Button*, 371 U.S. 415, 430 (1963) (explaining that First Amendment freedoms protect "cooperative, organizational activity" and "orderly group activity"); *Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights[.]"). Limiting who can hear your speech limits the effectiveness of that speech. After all, there is a big difference between singing in the shower alone and singing before a packed crowd in Carnegie Hall. Limiting who can listen to speech is not merely an "incidental burden on speech," but a restriction that alters the nature of the speech and also burdens the audience's right to listen.

Hence, when the State of New York last year attempted to limit how many people could attend worship services, there was no question that the religious organizations suffered a First Amendment injury by being required to turn away individuals from their worship services. This was the case even though New York's restrictions did not impact what the clergy at one of these worship services could say or what rituals they could perform. Restrictions on who could attend and participate were injury enough. The same is true here.[5]

---

[4] Furthermore, as discussed below in the context of standing, even if the theaters' own First Amendment rights were not implicated, the theaters would have standing to bring a First Amendment claim on behalf of their patrons given that the Key to NYC "substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980).

[5] The Mayor also attempts to distinguish between conduct intended to "convey a particularized message" and "conduct done for commercial reasons." But the law does not recognize such a distinction. The First Amendment protects speech whether it is "done for commercial reasons" or

### 3.  The Policy Is Content Based

The Key to NYC discriminates both on the content of the speech that is covered and on the speakers who are allowed to speak without restrictions. It is therefore subject to strict scrutiny.

The Mayor cites outdated precedent regarding what it means for speech to be "content neutral." For instance, the Mayor argues that the Key to NYC is not content based because it does not "target" theatrical expression and does not involve "disagreement with the message it conveys." Opp. at 14. But in *Reed*, 576 U.S. at 167, the Supreme Court expressly refuted the argument that content-based laws must reflect "disagreement with the message." Opp. at 14. The Supreme Court clarified that "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute." 576 U.S. at 167. Instead, the content-based test is quite simple: "a speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 171. *See also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (a regulation is content based when it "singles out specific subject matter for differential treatment" (quoting *Reed*, 576 U.S. at 169)). The Key to NYC is content-based because the only way to know whether it applies would be to consider whether the speech in question was religious speech (in which case the mandate would not apply) or theatrical expression (in which case it would apply). The primary distinction between a Sunday morning worship service and a Sunday afternoon theatrical performance is "the topic discussed or the idea or message expressed." The Key to NYC therefore "singles out" theatrical expression for disfavored treatment based on the type and subject matter of the speech.

---

not. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the [protected speech] is sold rather than given away."). Plaintiffs are allowed to charge for access to their speech without diluting their ability to "convey a particularized message."

The Key to NYC is also subject to strict scrutiny because it discriminates based on the identity of the speaker. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784–85 (1978) (explaining that laws cannot dictate "the subjects about which persons may speak and the speakers who may address a public issue"). Community organizations in the City are providing after-school programs focused on the performing arts; those programs are not covered by the Key to NYC.[6] The same is true if a theatrical production is put on by high school students using "art and performance as part of their curriculum," Opp. at 15.[7] And it is clear from the Mayor's brief that this "reflects a content preference," *Barr*, 140 S. Ct. at 2347 (quoting *Reed*, 576 U.S. at 170), in that it elevates speech done "for the purpose of education, social service provision and/or leading a community in religious worship" above speech which he deems solely "for the purpose of entertainment." Opp. at 15. The Mayor appears to conflate these two reasons for applying strict scrutiny and even suggests that one cancels the other out. But that isn't how the First Amendment works. For example, a law that barred anyone but a member of Congress from making political robocalls would be both content based and speaker based and would be even more problematic because of the carve-out for one preferred category of speaker. *Cf. Barr*, 140 S. Ct. at 2347. Yet

---

[6] The Mayor questions whether any community centers are engaged in activities akin to theatrical performances. A scan of the websites of these organizations reveals that they are. For instance, Phipps Neighborhoods offers an after-school program which includes visual and performing arts as well as fieldtrips to cultural events. *See* https://www.phippsny.org/programs/education/after-school. Similarly, Scan Harbor offers "high-quality training and performance opportunities in theater, dance, vocal and instrumental musical." https://www.scan-harbor.org/our-programs/.

[7] A month after announcing the Key to NYC, Mayor de Blasio announced a separate requirement for students over the age of 12 to be vaccinated to participate in extracurricular activities (but not curriculum-related activities). This policy is distinct from the Key to NYC and there are important differences. For instance, the school policy expressly allows for students to be exempted for medical reasons. https://www.schools.nyc.gov/school-life/health-and-wellness/immunizations. By contrast, a theater is not able to allow a patron in even if the patron has a valid medical excuse preventing vaccination.
https://www1.nyc.gov/assets/cchr/downloads/pdf/KeyToNYC_FactSheetBusiness-English.pdf.

that is precisely how the Key to NYC operates, imposing speaker- and content-based restrictions that each trigger strict scrutiny.

### 4.   Strict Scrutiny Also Applies Under the Equal Protection Clause

The Mayor concedes that if the Key to NYC burdens Plaintiffs' First Amendment rights, then it also must satisfy strict scrutiny under the Equal Protection Clause. Opp. at 17, 19. And as already shown, the Key to NYC imposes a content- and speaker-based restriction on Plaintiffs' speech. Strict scrutiny therefore applies.

### 5.   The Mandate Fails Strict Scrutiny

The Mayor does not claim that his differential treatment of theaters and other types of expressive activity can satisfy strict scrutiny, and for good reason. Under strict scrutiny, the Mayor must prove not only that his actions are in furtherance of a compelling interest, but also that "the means chosen" to achieve the compelling interest "are narrowly tailored to that goal." *Fisher v. University of Texas*, 570 U.S. 297, 311 (2013). To satisfy that level of scrutiny, the Mayor must prove that he could not achieve his goal of incentivizing vaccinations while still respecting the First Amendment rights of theaters and their patrons. He cannot do so.

Contrary to Defendant's assertion, Plaintiffs do not concede that the Key to NYC furthers a compelling governmental interest. Nor is this principle established by precedent. In 2015, the Second Circuit rejected a free exercise challenge to a vaccine mandate because it concluded that this mandate was neutral and generally applicable and therefore subject to rational basis scrutiny. *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015). And *Jacobson* did not involve a law which burdened fundamental rights. So neither the Supreme Court nor the Second Circuit has ever established that a vaccine mandate furthers a compelling governmental interest.

Incentivizing vaccination may be a compelling governmental interest in certain contexts. But invoking this interest at a high level of generality is not enough. *See Fulton v. City of*

*Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ("The City states these objectives at a high level of generality, but the First Amendment demands a more precise analysis."). Instead, the Mayor must show how the specific policies being challenged serve that function in a "meaningful way," *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 210 (2014), and how "the curtailment of free speech" is "actually necessary to the solution." *Brown*, 564 U.S. at 799.

Here, the Mayor does *not* claim that having unvaccinated patrons attend the theater is inherently dangerous, especially in light of the safety protocols that these theaters have put in place. He also does *not* claim that theaters have been responsible for significant spread of COVID-19 or that the Key to NYC is needed to prevent an outbreak.

Instead, the Mayor relies solely on the purported incentive that barring unvaccinated individuals from attending the theater will have on behavior: i.e., whether people will choose to get vaccinated who otherwise might not. But the evidence for this link is flimsy at best. *Brown*, 564 U.S. at 799-800. (explaining that the government "bears the risk of uncertainty" and so "ambiguous proof will not suffice"). The Mayor's only evidence is a survey from May 2021 which suggests that only between 16% and 21% of vaccine hesitant New Yorkers might be motivated to be vaccinated to "be[] able to go out to restaurants, the gym, and return to normal activities." Varma Aff. Ex. 1 at 24, 26. This was among the least motivating of the factors surveyed. It was only marginally more persuasive than just having public health officials strongly recommend vaccination and less persuasive than a recommendation from health care workers, an appeal to civic duty, or the desire to be able to safely see friends and family. *Id*. Moreover, theatrical performances are not mentioned expressly, and the Mayor has no way to parse out what percentage

of these New Yorkers—if any—might be swayed by the inclusion of theaters.[8] Common sense suggests that individuals are far more likely to be convinced by the easing of restrictions on everyday activities such as going out to eat or going to the gym than by an infrequent excursion like going to the theater.[9] In addition, a sizable majority of those attending theatrical productions come from outside of NYC, which suggests that the inclusion of theaters in the Key to NYC is likely to have at most a marginal impact on the vaccination rate of New Yorkers.[10] In other words, the Mayor cannot show that a ban on theater attendance is meaningfully contributing to increased vaccination rates of New Yorkers.[11]

And even assuming that a ban on theater attendance meaningfully furthers the Mayor's purported interest, the Key to NYC is poorly tailored. Most obviously, it is vastly underinclusive. The arbitrariness and poor tailoring of the Key to NYC is shown most clearly when considering the Mayor's treatment of the Orbach theater. On Sunday morning, anyone may attend the Church service held in that theater without restriction. Just hours later, anyone wishing to attend a theatrical

---

[8] The Mayor repeatedly provides numbers without any meaningful context. For instance, the Mayor notes that vaccinations rates are up 7-11% among certain demographics. Opp. at 6. But how much of this is due to the limitation on attending the theater? The Mayor does not know or does not say. Similarly, the Mayor notes that over the last 28 days there were an average of 1,224 confirmed new cases per day. Opp. at 4. Is this a lot? A little? How does this compare to earlier periods? The Mayor does not provide any meaningful context to allow the Court or the Plaintiffs to evaluate this data.

[9] For the 2018-2019 season, the Broadway League reports that the typical Broadway theatregoer attended between 4 and 5 shows a year. Broadway League, *The Demographics of the Broadway Audience 2018-2019 SEASON* (Nov. 2019), https://www.broadwayleague.com/research/research-reports/.

[10] The Broadway League reports that for Broadway shows in 2018-2019, only 20% of attendees were from New York City, 16% live in the surrounding suburbs, 46% came from elsewhere in the United States, and 19% came from foreign countries.

[11] To the extent that the Mayor selected theaters in an effort to reach the 18-34 year old demographic, demographic data suggests that this was a poor choice as the average age of the Broadway theatergoer was 42.3. *The Demographics of the Broadway Audience 2018-2019 SEASON*, *supra*.

performance must show proof of vaccination. The Mayor offers no justification whatsoever for this glaringly inconsistent and illogical policy other than baldly asserting that worship services and theatrical performances are just somehow different. But the only salient difference is the content of speech. Many plays and musicals from *Angels in America* and *Jesus Christ Superstar* to *Godspell* and *The Book of Mormon* touch on religious themes. Many people go to the theater to be uplifted and encouraged and edified just like those attending a church service. But the Mayor simply asserts without explanation that these two types of expression can be treated differently. Because the Mayor fails to justify this distinction, the Key to NYC cannot satisfy strict scrutiny.

The Mayor does not explain why he didn't also include a whole host of activities that might provide a similar or even *greater* incentive for New Yorkers to be vaccinated, such as attending worship services, socializing at a community center, shopping for a new outfit at the mall, or visiting a library or book store. Many of these are daily or weekly activities and therefore more likely to incentivize vaccination under the Mayor's own reasoning. This significant under-inclusiveness shows that the Mayor put First Amendment freedoms on the chopping block because he views these freedoms as less essential than other facets of life in New York City. *Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."). But this is exactly backwards, as the Constitution expressly protects these "first freedoms" and courts have placed them in a privileged position in our constitutional pantheon.

The Key to NYC is also more punitive than necessary. The Mayor does not explain, for instance, why it offers no exemptions for those with legitimate medical reasons or those with a recent negative COVID-19 test. The Mayor also fails to provide any timeline, goals, or metrics for when the mandate will be lifted, claiming that "further research and observation is needed before

the exact level [of vaccination] can be known." Opp. at 4. When constitutionally protected freedoms are on the line, that isn't good enough. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 379 (2000) ("This Court has never accepted mere conjecture as adequate to carry a First Amendment burden ….").

Even if this Court decides that intermediate scrutiny applies, the Key to NYC still fails. To satisfy intermediate scrutiny, the Mayor must show "that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). Given the paucity of evidence that banning theater attendance is necessary to achieve the government's interest, the Key to NYC cannot survive. The City also fails to show that "it actually tried or considered less-speech-restrictive alternatives" before adopting the Key to NYC. *Billups v. City of Charleston*, 961 F.3d 673, 687 (4th Cir. 2020). Instead, the City adopted the ban as a first resort since it saw theaters as "purely recreational" and therefore less important than other activities. Finally, the Key to NYC does not "leave open ample alternative channels of communication," *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983), because it categorically bars the unvaccinated from attending live theater in NYC for the indefinite future. The Key to NYC is unconstitutional under either strict or intermediate scrutiny.

## II.     The Other Preliminary Injunction Factors Also Support an Injunction

Plaintiffs also prevail on the other elements supporting a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Key to NYC directly limits and chills speech by barring individuals from attending live theater. *See Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003). Plaintiffs also suffer from the risk of financial penalties and even criminal liability, a fact that Defendant does not dispute. The public

interest strongly supports enjoining a law that violates the First Amendment. *See Agudath Israel*, 983 F.3d at 637 ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). And Defendant does not dispute that theaters can operate safely following existing public health protocols; he merely speculates that some number of New Yorkers might choose not to be vaccinated if they are allowed to attend the theater. Accordingly, there is no compelling public health interest that could overcome the strong First Amendment interests at stake in this case.

### III.   Plaintiffs Have Standing

Defendant separately argues that Plaintiffs lack standing to bring their lawsuit. This halfhearted argument strains credulity, given that the Mayor concedes that Plaintiffs are subject to the Key to NYC mandate and that they are subject to thousands of dollars in fines for failing to comply. Even if Plaintiffs are currently in full compliance with the mandate, there remains the very real risk that an employee will accidentally let someone in without valid proof of vaccination, especially given the fact that individuals are trying to improperly use others' vaccine cards. Russell Decl. ¶ 31. An injunction would fully remedy these harms.

The Mayor argues more particularly that Plaintiffs do not suffer a First Amendment injury. But as already discussed above, a theater is injured when it is barred from admitting patrons because this prohibition impacts the theater's own First Amendment freedom to speak before an audience of its choosing. And even if that is not the case, Plaintiffs still have standing to bring a First Amendment claim on behalf of their patrons. Because Plaintiffs have suffered an injury-in-fact and the Key to NYC "substantially abridges" the First Amendment rights of unvaccinated individuals to attend the theater, Plaintiffs are entitled to raise the First Amendment rights of their

patrons. *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. at 634. *See also Virginia v. Am. Booksellers Ass'n, Inc*., 484 U.S. 383, 393 (1988) (ruling that a bookstore could raise a First Amendment argument because they "alleged an infringement of the First Amendment rights of bookbuyers").

The Mayor also argues that a few of the Plaintiffs do not suffer an injury because their current policies may go beyond the Key to NYC in a few respects. But all the Plaintiffs would benefit from an order enjoining the strict enforcement of the Key to NYC because it would allow them to set their own policies with respect to vaccination, free from the threat of fines and other penalties. *See* Gaynes Decl. ¶¶ 5–9. *See also* Russell Decl. ¶¶ 26–33; Martin Decl. ¶¶ 5–8.[12]

Moreover, for more than a year and half, the City and State of New York have repeatedly and unjustifiably treated theaters as hotbeds of disease. Accordingly, theaters must go out of their way to convince potential customers that going to the theater is safe. Russell Decl. ¶¶ 33, 42. The Mayor says that it is a "a puzzling assertion" that the vaccine mandate "would somehow prejudice the public toward theaters." Opp. at 23. But this is only puzzling if we ignore the history of New York treating theaters as more dangerous than other businesses by denying them the ability to open despite their willingness to employ reasonable safety precautions. It is hardly surprising that the public would not quickly forget this association. Securing an injunction would help dispel the spurious insinuation that theaters are unsafe and give theaters the freedom to set policies that adequately protect their patrons while allowing patrons to attend the theater on equal footing with parishioners who attend church service in the same space. Plaintiffs have standing and a preliminary injunction should be granted.

---

[12] Mr. Gaynes clarifies in his declaration that he inaccurately thought that full vaccination was required and does not intend to employ a stricter vaccination policy than that required by the City. Gaynes Decl. ¶¶ 8–9.

DATED: October 27, 2021.

Respectfully submitted,

s/ Daniel M. Ortner

JAMES G. MERMIGIS, ESQ.    DANIEL M. ORTNER*
The Mermigis Law Group, P.C.   Pacific Legal Foundation
85 Cold Spring Road, Suite 200  555 Capitol Mall, Suite 1290
Syosset, New York 11791     Sacramento, California 95814
Telephone: (516) 353-0075    Telephone: (916) 419-7111
Email: James@MermigisLaw.com  Facsimile: (916) 419-7747
                           Email: DOrtner@pacificlegal.org

GLENN E. ROPER*
Pacific Legal Foundation
1745 Shea Center Drive, Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: GERoper@pacificlegal.org

*Pro Hac Vice

*Counsel for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

<div style="margin-left:50%">

s/ Daniel M. Ortner

DANIEL M. ORTNER*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: DOrtner@pacificlegal.org

*Pro Hac Vice*

*Counsel for Plaintiffs*

</div>

17