UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12 3 2021
```

THE CLEMENTINE COMPANY LLC. d/b/a THE
THEATER CENTER, WEST END ARTISTS
COMPANY d/b/a THE ACTORS TEMPLE;
SOHO PLAYHOUSE INC. d/b/a SOHO
PLAYHOUSE; and CARAL LTD. d/b/a
BROADWAY COMEDY CLUB,

No. 21-cv-7779

                                    Plaintiffs,

       -against-

BILL de BLASIO, in his Official Capacity as
Mayor of the City of New York,

                                    Defendant.

## DECISION AND ORDER DENYING
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

McMahon, J.:

       Plaintiffs are a group of small theaters and comedy clubs in New York City (the "City")

subject to the "Key to the City" vaccine mandate, which requires proof of vaccination for

Plaintiffs' patrons and staff. Plaintiffs have filed a complaint against Defendant Mayor Bill de

Blasio (the "Mayor" or "Defendant") alleging that this vaccine mandate violates their First and

Fourteenth Amendment right to free speech and Fourteenth Amendment right to equal protection

of the laws. (Dkt. No. 7).

       They now move this Court for a preliminary injunction to halt enforcement of the vaccine

mandate against them (the "Motion"). (Dkt. No. 12). Defendant opposes the Plaintiffs' Motion on

the grounds that Plaintiffs lack standing, are unlikely to succeed on their constitutional claims, and

do not satisfy the remaining requirements for issuance of a preliminary injunction (Dkt. No. 20).

Because the Court agrees that Plaintiffs lack standing and are unlikely to succeed on their claims, the motion for a preliminary injunction is DENIED.

## BACKGROUND

*A. The COVID-19 Pandemic and the Attendant Executive Orders*

On March 12, 2020, Defendant Mayor de Blasio declared a state of emergency in the City in response to the outbreak and spread of the COVID-19 virus. (Amended Complaint, Dkt. No. 7 ("AC"), ¶ 20). On March 16, 2020, Defendant Mayor de Blasio issued Executive Order 100 closing theatres, comedy clubs, and other business in the City – in an attempt to slow the spread of the COVID-19 virus, "flatten the curve," and prevent hospitals from becoming overwhelmed. (*Id.* ¶¶ 20, 24). Plaintiffs were closed until April 2, 2021. (*Id.* ¶ 30)

On April 2, 2021, theaters and comedy clubs in New York were permitted to reopen at 33% capacity (*Id.*). Shortly thereafter, on May 19, 2021, Defendant Mayor de Blasio lifted the capacity restrictions on theatres and comedy clubs, allowing the Plaintiffs to reopen without capacity limits but with certain health and safety requirements, such as ensuring that patrons wear masks. (*Id.* ¶¶ 35, 36). Beginning June 16, 2021, the mask requirement was limited to ensuring unvaccinated patrons wear a mask. (*Id.* ¶ 36).

*B. The "Key to the City" Vaccine Mandate*

Beginning August 17, 2021, Mayor de Blasio instituted a proof of vaccination requirement for all patrons over the age of 12 and employees, interns, volunteers, and contractors at indoor recreational businesses in the City, including theatres and comedy clubs. (EEO 250 §§ 2.b, 2.f(8); AC ¶ 37). The vaccine mandate was termed the "Key to the City." (AC ¶ 38).

The Key to the City vaccine mandate applies to "covered entities," defined as "any entity that operates one or more covered premises, except . . . pre-kindergarten through grade twelve (12)

public and nonpublic schools and programs, houses of worship, childcare programs, senior centers, community centers . . ." *See* EEO 250 § 2.f(2). "Covered premises" are indoor food services, indoor gyms and fitness settings, *id.* at § 2.f(3)(ii) & (iii), and

> indoor portions of the following locations, regardless of the activity at such locations: movie theaters, music or concert venues, adult entertainment, casinos, botanical gardens, commercial event and party venues, museums, aquariums, zoos, professional sports areas and indoor stadiums convention centers and exhibition halls, hotel meeting and event spaces, performing arts theaters, bowling alleys, arcades, indoor play areas, pool and billiard halls, and other recreational game centers[.]

*Id.* at § 2.f(3)(i).

Covered entities are required to check vaccination status of their patrons and staff or pay a fine -- $1000 for the first failure to check vaccination status, $2000 for the second failure, and $5000 for each subsequent failure. (AC ¶ 38).

Plaintiffs do not allege that they have been assessed any fines under the Key to the City vaccine mandate. Instead, they allege that their harms have been the possibility of fines or a criminal misdemeanor charge if the mandate is enforced, that Plaintiffs have had to turn away patrons (as their "guests struggle to comply with New York's mandate and to show proof of vaccination"),[1] and that the mandate stigmatizes the Plaintiffs, the stigma being that theatres are now allegedly perceived as "uniquely dangerous venues." (*Id.* ¶¶ 38, 52–61).

C. *The Instant Lawsuit*

On September 16, 2021, Plaintiffs filed a complaint against Defendant Mayor de Blasio asserting two claims: (1) violations of the first and fourteenth amendments (freedom of speech) and (2) violation of the fourteenth amendment (equal protection). (Compl., Dkt. No. 1). Plaintiffs

---

[1] Wrapped up in turning away patrons, Plaintiffs allege that they have faced "angry outbursts" by customers (such as being "screamed at, physically threatened, or even spat on"), have issued refunds for customers denied entry, and have hired more staff to check vaccination status.

3

allege as the basis for both of their claims that, under the vaccine mandate, Plaintiffs "are prohibited from admitting customers without requiring proof of vaccination when putting on theater or comedy shows" while churches, schools, and community centers are not subject to the same mandate. (*Id.* ¶ 4). For the first, Plaintiffs claim this violates the Free Speech Clause of the First Amendment; for the second, Plaintiffs claim this violates the Equal Protection Clause of the Fourteenth Amendment.

Specifically, as to their first claim, Plaintiffs allege that their right to free speech has been violated because "Unvaccinated individuals (or individuals without sufficient proof of having been vaccinated) are barred by the Key to NYC vaccine mandate from attending a theatrical or comedy performance at one of Plaintiffs' theaters, but not a worship service in the exact same venue or a theatrical or comedy performance put on at a community center or school." (*Id.* ¶ 68). Plaintiffs allege that the vaccine mandate "discriminates against Plaintiffs by singling out theaters and comedy clubs for more restrictive treatment based on the content of speech that theaters and comedy clubs host and the identity of the speaker as a theater or comedy club." (*Id.* ¶ 5).

As to their second claim, Plaintiffs allege that they are not being afforded equal protection under the laws because the Key to the City vaccine requirement "requires Plaintiffs to check vaccination status and exclude unvaccinated individuals (or individuals without sufficient proof of having been vaccinated) from attending a theatrical or comedy performance at one of Plaintiffs' theaters or comedy clubs, but a worship service in the exact same venue or a theatrical or comedy performance put on at a community center or school is not subject to those same requirements." (*Id.* ¶ 79).

The Amended Complaint, filed on September 21, 2021, makes the same claims based on the same allegations. (*See, e.g.*, AC ¶¶ 67, 78). Indeed, the only substantive change in the Amended

Complaint is to remove one plaintiff, the Players Theater Management Corp. d/b/a The Players Theater, from the complaint.

### D. *Plaintiffs' Motion for Preliminary Injunction*

On September 21, 2021, Plaintiffs filed this Motion, seeking a preliminary injunction that would halt enforcement of the "Key to NYC" Vaccine Mandate against Plaintiffs. (Dkt. No. 12). In support of their motion, Plaintiffs submit a declaration from Catherine Russell, the General Manager and Owner of Plaintiff The Clementine Company, setting forth the extensive voluntary safety precautions that the Clementine Company took as early as March 2021 in preparation for reopening, including mandatory staff vaccination, as well as the alleged harms the Clementine Company has suffered under the vaccine mandate, such as the threat of enforcement, turning away customers, and stigma. (Dkt. No. 15). On reply, Plaintiffs also submit new declarations from Ed Gaynes, the General Manager and Owner of Plaintiff Actors Temple Theatre (Dkt. No. 30) and Al Martin, the General Manager and Owner of Plaintiff Broadway Comedy Club (Dkt. No. 31), attesting to the harms they have suffered under the mandate.

Plaintiffs argue they are likely to succeed on the merits of their claims because the vaccine mandate is constitutionally suspect content-based discrimination subject to strict scrutiny and "under that demanding standard . . . cannot be justified." (Dkt. No. 13 ("Mot."), at 10). Plaintiffs argue that both their "free speech" and "equal protection" claims are subject to strict scrutiny, on the basis that their equal protection claim concerns the impingement of their fundamental right to free speech. (*Id.* at 19-20). Under the strict scrutiny, the vaccine mandate must be "'narrowly tailored' to meet a 'compelling governmental interest.'" (*Id.* at 20 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015)). While Plaintiffs agree that the government "has a compelling interest in protecting public health by preventing the spread of an infectious disease," they argue

that the City's compelling interest is "insufficient to justify" the vaccine mandate. (*Id.* at 20). Plaintiffs argue that the City's admittedly compelling interest is "insufficient" because the government has not offered "a compelling justification for its failure" to treat the Plaintiffs the same as "houses of worship, schools, or community centers" where the vaccine mandate is not imposed. (*Id.* at 20-21).

Plaintiffs argue that they will suffer the following irreparable harms absent an injunction: (1) loss of their first amendment freedoms; (2) "imminent risk of financial penalties and even criminal liability" under the vaccine mandate; (3) stigma impacting "Plaintiffs' business and expressive activities." (*Id.* at 23-24).

Finally, Plaintiffs argue that the balance of equities and public interest favors an injunction because the vaccine mandate impacts the Plaintiffs' constitutional rights and "securing First Amendment Rights is in the public interest." (*Id.* at 24) (quotation and citation omitted). Plaintiffs state that an injunction is necessary to halt "the Mayor's disfavored treatment of plaintiffs." (*Id.*).

In his opposition, the Mayor argues that Plaintiffs are not likely to succeed on their claims. First, the Mayor argues that, under the Supreme Court precedent set forth in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the City's vaccine mandate is subject to a deferential standard because it was "enacted to protect the public health" and should not be disturbed unless the City exercised its power "in an arbitrary, unreasonable manner." (Dkt. No. 20 ("Opp."), at 9-10). The Mayor argues that the vaccine mandate is not arbitrary, unreasonable, or oppressive, and bears a substantial relation to public health and safety and should be upheld. (*Id.* at 10).

Second, the Mayor argues that, even if *Jacobson* does not apply, Plaintiffs' claims fail. As to the first claim, the Mayor states that the Key to NYC vaccine mandate does not prevent the Plaintiffs from engaging in expressive activity. Instead, "Key to NYC regulates patrons' admission

into the venue on the basis of vaccination status, not Plaintiffs' expression or performance." (*Id.* at 12). The Mayor argues that while Plaintiffs allege they have had to turn away unvaccinated patrons, they have not been forced to change their programming, expression, or performances in any way. (*Id.*). Further, the fact that Plaintiffs either admit or turn away patrons, the Mayor argues, is not expressive conduct and thus does not implicate the First Amendment. (*Id.* at 13).

Even if it were expressive conduct, the Mayor argues, the law itself is "content neutral" and intermediate scrutiny applies, which requires that the regulation be reasonable, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication of information. (*Id.* at 11). Under that standard, the law survives because it is narrowly tailored – applying only to "entertainment activities . . . not . . . businesses or entities needed for essential daily living, and does not interfere with education, social service provision, or religious worship" – to serve the government's significant public health interest in "incentivizing" vaccination, reducing hospitalizations, illness, disability, and death, and preventing further economic damage from viral outbreaks. (*Id.* at 16). The Mayor states that channels of communication are unaffected, as the law permits venues to remain open and does not interfere with the chosen form of expression. (*Id.* at 16-17).

As to the second claim, the Mayor argues that Plaintiffs' claim fails because the vaccine mandate's classifications do not burden a fundamental right or target a suspect class, and so survives as rationally related to the government's legitimate interest in incentivizing vaccination to reduce the spread of infection, hospitalizations, illness, and death related to COVID-19. The Mayor points out that the classification set forth is the vaccine mandate is that vaccination is required "for participation in and employment in [indoor] recreational activities in the City" but not for "businesses or entities needed for essential daily living" or education, social services, and

religious worship. (*Id.* at 16, 18). The reason for that classification, the Mayor submits, is that "evidence suggests that most adults would choose to get vaccinated if it were required for dining and/or entertainment" and "adults ages 18-34 most frequently patronize restaurants and other entertainment venues and also have the lowest reported rate of vaccination"; thus the government's mandate was imposed with the "reasonable and rational" goal of "increase[ing] vaccination rates by requiring vaccination to engage in entertainment activities." (*Id.* at 18). The Mayor contends that the Plaintiffs are not similarly situated with churches, schools, or community centers because those organizations "do not exist for the purpose of entertainment." (*Id.* at 15, 18).

Third, the Mayor argues that Plaintiffs lack standing, as they have not suffered any "injury-in-fact" traceable to the Mayor's conduct that can be redressed by a favorable decision. (*Id.* at 20). In support, the Mayor argues that (1) both Soho Playhouse and the Actors Temple Theatre implemented a full vaccination requirement (which is more stringent than even the vaccine mandate) since as early as July 2021 – before the vaccine mandate was imposed – so cannot credibly claim injury or a threat of enforcement; (2) only Clementine Company has proffered "evidence" regarding the Plaintiffs' purported injury by way of affidavit and those injuries are not sufficient to confer standing; (3) "turning away patrons who are not vaccinated" is not an injury to Plaintiffs, but rather is an injury to "would-be patrons"; and (4) Plaintiffs' expression has not been affected by the vaccine mandate. (*Id.* at 21-22).

Finally, the Mayor argues that Plaintiffs have not shown they will suffer irreparable harm, that the balance of equities weigh in their favor, or that a preliminary injunction is in the public interest. (*Id.* at 22-23).

## DISCUSSION

### I.   Standard

The grant of a preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain one, a movant must demonstrate four things: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *see also Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010) (noting that a preliminary injunction analysis "requires the use of the Supreme Court's four-factor test in every case."). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 266 (2d Cir. 2021) (citing *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020)).

The burden of proof rests on the party seeking the extraordinary relief. *See* Fed. R. Civ. P. 65(b); *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 443 (1974). "Furthermore, the movant is held 'to a heightened standard' where, as here: (i) an injunction is 'mandatory', *i.e.*, altering the status quo rather than maintaining it . . . '" *Geller v. Cuomo*, 476 F.Supp.3d 1 (S.D.N.Y. 2020) (quoting *New York ex. Rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). "In such cases, the movant must show a 'clear' or 'substantial' likelihood of success on the merits." *Id.*

### II.   Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits

For the reasons discussed below, Plaintiffs have not demonstrated either that they have suffered any concrete injury fairly traceable to the Defendant's conduct that is sufficient to confer standing, or that Plaintiffs' claims – under the First and Fourteenth Amendments – even fall into the "zone of interests" protected by the constitutional guarantees they invoke (and thus fail for

prudential reasons as well). Finally, even if Plaintiffs had demonstrated they have standing to assert their claims, each are unlikely to succeed on the merits.

### A. Standing

#### 1. <u>Governing Law</u>

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.' For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). To have Article III standing, a plaintiff must have suffered "invasion of a legally protected interest, which is (a) concrete and particularized . . . (b) actual or imminent, not 'conjectural or hypothetical'" (c) fairly traceable to the defendant's challenged behavior, not the "result of the independent action of some third party not before the court" and (d) likely to be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

##### a. Organizational Standing

The three traditional standing "requirements apply equally to organizations as to natural persons." *New York Civil Liberties Union v. New York City Transit Authority*, 675 F.Supp.2d 411, 424 (S.D.N.Y. 2009) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19 (1982)); *see Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."). To establish standing in its own right, the organization "'must meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *New York Civil Liberties Union*, 675 F.Supp.2d at 425 (quoting *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir.1998)).

b.  Associational Standing

Where an organization attempts to bring suit not on its own behalf but instead on behalf of its members, the plaintiffs have to establish that (1) "'its members would otherwise have standing to sue in their own right,'" (2) "'the interests at stake are germane to the organization's purpose,'" and (3) "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "A plaintiff asserting associational standing must 'make specific allegations establishing that at least one identified member had suffered or would suffer harm.'" *Art and Antique Dealers League of America, Inc. v. Seggos*, 2019 WL 416330, at *2 (S.D.N.Y. Feb. 1, 2019) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009)). "An organizational plaintiff's 'self-description of the activities of its members' and its assertion that there is a 'probability that some of those members are threatened with concrete injury' will not suffice." *Id.* (quoting *Summers*, 555 U.S. at 497).

c.  Prudential Considerations

In addition to the three traditional elements, "[t]he doctrine of standing" also "embraces . . . 'prudential' requirements." *Ctr. Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 195-196 (2d Cir. 2002) (Sotomayor, J.) (quoting *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir.1992)). "The prudential requirements of standing have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial 'self-restraint' further to protect, to the extent necessary under the circumstances, the purpose of Article III." *Id.* (quoting *Sullivan*, 962 F.2d at 1106) (quotation marks and brackets omitted).

Under this doctrine, "the Supreme Court 'has refrained from adjudicating abstract

questions of wide public significance which amount to generalized grievances,' and requires that 'the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Santore v. Cuomo*, 2020 WL 9810016, at *3 (N.D.N.Y. Aug. 14, 2020) (quoting V*alley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)). "Pursuant to the doctrine of prudential standing, a court must ask whether a plaintiff's claim rests on the legal rights of a third party, asserts only a generalized grievance, or asserts a claim that falls outside the zone of interests protected by the legal provision invoked." *Ctr. Reprod. L. & Pol'y v. Bush*, 304 F.3d at 195-196.

### d.   Plaintiffs' Burden to Demonstrate Standing

At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment. Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts" that establish the "familiar elements of standing." *United States Dep't of Homeland Sec.*, 969 F.3d at 59-60 (finding that complaining states had sufficiently established injury where they had submitted declarations specifically documenting the harms alleged) (quotation and citation omitted). Evidence offered "will be taken to be true" for the purpose of the standing analysis. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan*, 504 U.S. at 561)). An "assertion in a brief – unsupported by factual allegations in the Amended Complaint or in a declaration – is not sufficient." *Aviles v. Blasio*, 2021 WL 796033, at *16 (S.D.N.Y. Mar. 2, 2021) (citing *United States Dep't of Homeland Sec.*, 969 F.3d at 59).

### 2.   Analysis

Plaintiffs assert that the legally protected interests at stake in this case are their rights to free speech and equal protection of the law, and that they have suffered an invasion of those

interests that is concrete, particularized, actual or imminent because: (1) Plaintiffs' face the possibility of fines or criminal misdemeanor if the mandate is enforced; (2) they have had to turn away patrons, which prevents them from "speak[ing] before an audience of [their] choosing"; and (3) they have suffered the stigma of being unfairly treated as "hotbeds of disease" or "more dangerous than other businesses." (Dkt. No. 29 ("Reply"), at 14-15; *see* Mot. at 9). These injuries are proffered as harms that the Plaintiffs themselves have suffered as organizations.

Plaintiffs also argue on reply that they have standing to bring a First Amendment claim on behalf of their patrons. (Reply, at 14-15). They claim the vaccine mandate "'substantially abridges' the First Amendment rights of unvaccinated individuals to attend the theater" and the Plaintiffs may sue on behalf of those patrons they turn away. (*Id.*).

a.   Plaintiffs Have Not Demonstrated an Injury-in-Fact to Themselves

"Standing . . . is not an ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm." *Summers*, 555 U.S. at 499. "The injury-in-fact element requires that the plaintiff be 'the proper party to bring this suit.'" *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997). In the First Amendment context, "an alleged deprivation of First Amendment rights alone may suffice to constitute an injury in fact." *New York Civil Liberties Union*, 675 F.Supp.2d at 425-426 (citing *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir.2003)). Similarly, in the Equal Protection context, a plaintiff may demonstrate standing "to raise an equal protection claim when the state imposes 'unequal treatment' on the basis of a protected characteristic . . . " *MGM Resorts International Global Gaming Development, LLC v. Malloy*, 861 F.3d 40, 45 (2d Cir. 2017) (quoting *Heckler v. Mathews*, 465 U.S. 728, 738 (1984)).

"A cognizable interest alone is not sufficient, however." *New York Civil Liberties Union*, 675 F.Supp.2d at 426. "'[I]n ruling on standing, it is both appropriate and necessary to look to the

substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated.'" *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 102 (1968)). "Such inquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power." *Flast*, 392 U.S. at 102.

As a threshold matter, I can find no "logical nexus between the status asserted and the claim sought to be adjudicated" in this case. *See Flast*, 392 U.S. at 102. Plaintiffs claim a protected interest in free speech and equal protection of the laws. But the vaccine mandate does not prevent the theatres or comedy clubs from expressing their message in any way, nor does the mandate treat plaintiffs differently from other theatres or comedy clubs, or from any other indoor recreational business. It is not conceivable that the plaintiffs' First and Fourteenth Amendment rights are being infringed by the vaccine mandate – they are open for business; they are putting on shows.

Plaintiffs' allege that they have suffered injury because they have had to turn away unvaccinated persons who want to watch their shows. But that does not work any First Amendment injury to the Plaintiffs, who remain perfectly free to present their artistic wares, and are doing so every night. The injury, if injury there be, is to the person who is not allowed to attend the show. But that claim properly belongs to the customer. Plaintiffs have not demonstrated that their own constitutional rights are being abridged because any particular member of the public cannot attend their performances. Ergo, they have not alleged an injury-in-fact on that score.

Plaintiffs also do not allege that they have been assessed any fines or otherwise penalized in connection with their enforcement of the vaccine mandate, and do not credibly allege any likelihood that this will occur in the future. "[T]he threat of prosecution under the ordinance at issue must be genuine; speculative or imaginary threats will not confer standing." *See White's*

*Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000) (citing *United Public Workers of Amer. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)). "When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 299-300 (1979)) (*quoting Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). That Plaintiffs "do not believe that the City of New York should be compelling theatres to exclude customers who wish to attend the theatre" does not raise an inference that they are about to be penalized for failing to enforce the vaccine mandate. (*See* Dkt. Nos. 30, at ¶ 7; 31, at ¶ 6).

Nor does the record support any credible claim of imminent prosecution. In fact, Plaintiffs allege in the AC that they "post prominently on their website and social media that customers need to provide proof of vaccination" to enter the theatre or comedy club, and that they in fact enforce the mandate (AC ¶ 54) – which means there is no possible basis to cite or prosecute them for violating it. In fact, both Soho Playhouse and Actors Temple Theatre required vaccination as a condition of entry before the City imposed its vaccine mandate; and their rules are more strict than the mandate imposed by the City.[2] Moreover, all of the plaintiffs declare that they fully "support vaccination" (Dkt. Nos. 15, at ¶ 34; 30, at ¶7; 31, at ¶ 6) and enumerate in their motion papers the many voluntary measures they have undertaken to advance and support vaccination and many other health and safety measures against COVID-19. (*See* Dkt. No. 15, at ¶¶ 35-37; Mot. at 20).

---

[2] A court "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F. 3d 161, 164 (2d Cir. 2012). The vaccination requirements imposed by Soho Playhouse and Actors Temple can be found on their websites. While Plaintiff Actors Temple Theatre argues in reply by declaration that its owner "was under the mistaken impression" that its own vaccine requirements were no stricter than that of the vaccine mandate, that does not change my analysis. (Dkt. No. 30 ¶ 8).

The reason Plaintiffs emphasize the measure they have taken proactively is to demonstrate that they do not require any regulation from the City to deal with COVID. But that is not their decision to make. As *Jacobson* makes clear, in the face of a public health crisis, the state has the power to impose regulations to ensure the health and safety of the citizenry. *See Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). Plaintiffs' own actions indicate their belief that some extraordinary measures are needed for them to do business safely while a communicable and thus far incurable disease is spreading; they make no effort to show that the vaccine mandate imposed by the City is either unreasonable or arbitrary.

Defendant also argues that only the plaintiff Clementine Company has offered "evidence" about its purported injuries by way of affidavit (Opp. at 21-22); the other Plaintiffs – Soho Playhouse, the Actors Temple Theater, and Broadway Comedy Club – have not provided any supporting affidavit and so have not established an injury sufficient to confer standing.

In reply, Plaintiffs submit the reply declarations of the owners of the Broadway Comedy Club and the Actors Temple Theater attesting to the harms they suffered (but nothing from the Soho Playhouse). This additional "evidence" of the harm the Plaintiffs have suffered both comes too late and is nothing more than a recitation of the sweeping, unsupported and very generalized, non-specific allegations contained in the AC. (*See* AC ¶¶ 57–59, 61). The contents of these belated affidavits are insufficient to establish standing on a motion for preliminary injunction, which requires affidavits or "'other evidence [of] *specific* facts.'" *See United States Dep't of Homeland Sec.*, 969 F.3d at 59 (quoting *Cacchillo*, 638 F.3d at 404). These affidavits contain nothing of the kind. For that additional reason, I find Soho Playhouse, the Actors Temple Theater, and Broadway Comedy Club have failed to establish the any injury in fact that would give them standing to assert claims for the violation of their First Amendment rights.

Finally, Plaintiffs allege that their operations are being "stigmatized" because they are being forced to turn away potential patrons. But these claims of stigma – I assume to create some sort of "stigma plus" injury, *see Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)– are plainly designed to "plead around" the utter lack of any actual injury in fact to plaintiffs from the vaccine mandate. There is no evidence in the record tending to show that Plaintiffs are being unfairly characterized as "hotbeds of disease" or "more dangerous than other businesses," (Reply, at 14-15; *see* Mot. at 9); their claims of stigma are purely speculative. The vaccine mandate applies to patrons at every sort of venue where artistic performances are presented, both commercially (as with Plaintiffs) or for free. It also covers a broad spectrum of additional recreational businesses, such as gyms, spas, restaurants, movie theaters, casinos, botanical gardens, commercial event and party venues, museums, aquariums, zoos, professional sports areas and indoor stadiums, convention centers and exhibition halls, hotel meeting and event spaces, bowling alleys, arcades, indoor play areas, and pool and billiard halls. *See* EEO 250 § 2.f(3)(i). Plaintiffs do not offer any evidence suggesting that any special stigma is directed toward theatres and comedy clubs for complying with the vaccine mandate.

In short, Plaintiffs allege no injury in fact to themselves.

**Associational Standing**: In order to salvage their complaint, Plaintiffs assert, in their reply papers, that the vaccine mandate impinges the First Amendment rights of their potential customers. But they do not allege any of the elements of associational standing in their AC or establish any in their moving papers.

The first thing I must note is that pleadings cannot be amended in briefs, *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998), and new arguments that are first raised on reply are in general to be ignored. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). In the

very first paragraph of the AC, plaintiffs allege, "This civil rights lawsuit seeks to vindicate the constitutional rights of free speech and equal protection *for the Plaintiff theaters and comedy clubs* . . ." not its patrons. (AC ¶ 1) (emphasis added). Their eleventh-hour contention that they are protecting the rights of unvaccinated theatre-goers runs counter to this and runs afoul of both of these settled rules.

But I will overlook this procedural issue, because the contention is easy to dismiss. Plaintiffs bear the burden of demonstrating they have associational standing; they fail to meet it.

As set forth above, a finding of associational standing is only appropriate where the organization has established that (1) "'its members would otherwise have standing to sue in their own right,'" (2) "'the interests at stake are germane to the organization's purpose,'" and (3) "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Nat. Res. Def. Council*, 894 F.3d at 104 (2d Cir. 2018). To satisfy these elements, the Supreme Court admonishes that "plaintiffs-organizations" are "required . . . to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498. Generalized "self-description of the activities of its members" and a mere assertion that there is a "probability that some of those members are threatened with concrete injury" does not suffice. *Id.* at 497.

The very essence of associational standing is missing in this case. Plaintiffs are not suing on behalf of their "members;" they are suing on behalf of unnamed third-parties, who are not associated with them except by virtue of the fact that they are hypothesized to want to buy tickets to Plaintiffs' shows. It would be a real stretch to conflate "members" with "potential audience members." Even if they could sue on behalf of someone who is not a "member" of the plaintiff "organizations," Plaintiffs have not identified any *specific* person who is not vaccinated who even

wants to attend their performances but has been denied the opportunity to do so. While they claim that they have had to turn away unvaccinated patrons (*see* AC ¶¶ 68, 79), Plaintiffs fail to identify any actual person who was subject to this.

Plaintiffs likewise do not offer any evidence showing any of the remaining factors that could give rise to associational standing. Plaintiffs' argument on the subject of associational standing is limited to a single line in their reply brief: "Because Plaintiffs have suffered an injury-in-fact and the Key to NYC 'substantially abridges' the First Amendment rights of unvaccinated individuals to attend the theater, Plaintiffs are entitled to raise the First Amendment rights of their patrons." (Reply, at 14-15). Plaintiffs' own injury-in-fact (which, as was shown already, is non-existent) has nothing to do with associational standing. Any theatre-goer who wishes to sue to vindicate some purported First Amendment right to attend the theatre during a pandemic without being vaccinated is perfectly free to do so. The audience members do not need Plaintiffs to do that for them.

Additionally, prudential considerations confirm that it is improper for Plaintiffs to try to adjudicate grievances that rest, not on their own rights, but on the legal rights of third parties, who do not "fall within the zone of interests to be protected . . . by the . . . constitutional guarantee in question." V*alley Forge Christian Coll.*, 454 U.S. 464, 474. The constitutional guarantee in question – the guarantee particular to the *Plaintiffs* – is the right of a live entertainment venue to present shows – an activity that is at once constitutionally protected under the First Amendment and a commercial enterprise. As far as the pleading and the affidavits show, the plaintiff theatres are doing precisely that. The rights of unvaccinated individuals to be in attendance have nothing to do with whether the Plaintiff theatres can present their performances to a paying audience. A theatre's First Amendment right to speak does not entitle it to an audience of its choosing – it only entitles the theatres not to be silenced. They are not being silenced.

Thus, Plaintiffs have not and cannot demonstrated that they have standing to bring claims

on behalf of their putative customers.

### B. Plaintiffs Are Unlikely to Succeed on the Merits

"Although a showing of irreparable harm is often considered the 'single most important prerequisite for the issuance of a preliminary injunction,' *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted), '[c]onsideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Geller II*, 476 F.Supp.3d at 12 (quoting *N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

#### 1.   Plaintiffs' Claims Are Unlikely To Succeed Under *Jacobson*

Even if Plaintiffs have standing to pursue their constitutional claims, the claims are unlikely to succeed under the Supreme Court standard set forth in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). That case held that, in face of "an epidemic of disease which threatens [society's] members" judicial scrutiny of measures imposed by a government to reduce the spread of said disease is reserved for a measure that "has no real or substantial relation to" the goal of protecting "the public health, the public morals, or the public safety," or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. The Supreme Court explained in *Jacobson* that the "court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case.'" *Id.* at 27-28.

A number of recent COVID-19 related cases have found that this standard remains applicable in the face of today's pandemic. *See Hopkins Hawley LLC v. Cuomo*, 518 F.Supp.3d 705, 712 (S.D.N.Y. Feb. 9, 2021) ("The Court concludes that *Jacobson*'s deferential standard of judicial review is still applicable."). For example, in *Geller v. de Blasio*, --- F.Supp.3d ----, 2020

WL 2520711 (S.D.N.Y. May 18, 2020) ("*Geller I*"), a protest organizer sued the City mayor and

police commissioner, challenging the City's ban on non-essential gathering of individuals as a

violation of her First Amendment rights and moved for a temporary restraining order and

preliminary injunction enjoining the ban. *Id.* at *1. In response, Judge Cote agreed with *Jacobson*'s

deferential standard, explaining that:

> The March 25 Executive Order's ban on non-essential gatherings represents just
> one of the many ways in which our ordinary way of life has been suspended to
> protect public health and safety in this historic time. There can be no doubt that
> combatting the spread of COVID-19 has come at a high cost. Indeed, it has brought
> to a halt much of the economic activity in the City. Nonetheless, in every well-
> ordered society charged with the duty of conserving the safety of its members the
> rights of the individual in respect of his liberty may at times, under the pressure of
> great dangers, be subjected to such restraint, to be enforced by reasonable
> regulations, as the safety of the general public may demand. *Jacobson*, 197 U.S. at
> 29, 25 S.Ct. 358. This is one such time.

*Id.* at *4-5. Judge Cote further went on to explain that the ban on non-essential gathering was

content-neutral, "'serv[ing] purposes unrelated to the content of expression ... even if it has an

incidental effect on some speakers or messages but not others,'" *id.* at *3-4 (quoting *Hobbs v. Cty.*

*of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005), and that the ban survived the attendant scrutiny:

> Given the severity of the public health crisis, the City has taken measures that are
> reasonable and narrowly tailored in temporarily prohibiting public gatherings.
> While a measure restricting all public group activity may not likely be found
> narrowly in ordinary times, these times are extraordinary. The City has
> demonstrated that the scientific and medical communities believe that preventing
> in-person gatherings is crucial to any strategy of containment. As the City has
> argued, the declining rates of infection and death among New Yorkers is evidence
> not that the gatherings ban is overly broad, but rather that it is effective. As there is
> no evidence to suggest that the City has misunderstood the dangers of person-to-
> person spread of COVID-19, the Court declines to second guess the City's measure
> that clearly seeks to mitigate this risk.

*Id.* at *4

Similarly, in *Geller v. Cuomo*, 476 F.Supp.3d 1 (S.D.N.Y. 2020) ("*Geller II*"), where the same plaintiff moved again for a preliminary injunction against a different version of the ban, Judge Ramos agreed with Judge Cote's reasoning, adding that:

> the Chief Justice's words in *South Bay Pentecostal Church v. Newsom*, seem particularly fitting: public officials responding to a public health crisis must be afforded especially broad latitude, such that they should not be open to "second-guessing" by an "unelected federal judiciary which lacks the background, competence, and expertise to assess public health and is not accountable to the people."

*Id.* at \*14-15 (quoting *South Bay Pentecostal Church v. Newsom*, —— U.S. ——, 140 S.Ct. 1613, 1613–14, 207 L.Ed.2d 154 (2020) (Roberts, C.J. concurring). Judge Ramos acknowledged too that "courts across the country have relied on *Jacobson* in refusing to enjoin state and local restrictions aimed at protecting the public against the spread of COVID-19." *Id.* at \*15. Thus, "the Court ha[d] no difficulty in concluding, as Judge Cote did, that the restriction was enacted to protect the public health and bears a real and substantial relation to the public safety concerns at issue." *Id.* at \*15-16 (applying *Jacobson* standard). Judge Ramos likewise denied the motion for preliminary injunction.

This year, in *Hopkins Hawley LLC v. Cuomo*, 518 F.Supp.3d 705 (S.D.N.Y. Feb. 9, 2021), a case seeking to enjoin restaurant dining restrictions in New York state during the COVID-19 pandemic, my colleague Judge Crotty recognized developments in the jurisprudence surrounding *Jacobson* including the "chorus of doubts" as to its applicability in the modern era. *Id.* at 710-713. Ultimately, he concluded that *Jacobson* has only ever been questioned in the context of a free exercise claim where Plaintiffs had otherwise demonstrated they met strict scrutiny; as such, he found that it has never been overruled and remains a viable precedent. *Id.* Indeed, he noted that "*Jacobson*'s modern reprise despite its old age only further underscores just how unprecedented the current pandemic is and the pressing need to grant state and local officials a wide berth as they

'actively shap[e] their response to changing facts on the ground.'" *Id.* at 713 (quoting *South Bay*, 140 S. Ct. at 1613–14). As Judge Crotty pointed out, "*Jacobson* provides a workable framework that balances the delicate considerations at play—responding to the COVID-19 crisis versus maintaining Constitutional liberties." *Id.* In an abundance of caution, in denying the preliminary injunction motion, Judge Crotty analyzed the Plaintiffs' likelihood of success under both the *Jacobson* and regular Constitutional standards. I agree with this approach and do the same here.

Under *Jacobson*'s deferential standard, the vaccine mandate easily survives judicial scrutiny, as it has a "real or substantial relation to" the goal of protecting public health. As explained further below, the City enacted the vaccine mandate with the goal of protecting public health, as it seeks to encourage vaccination against COVID-19, which in turn reduces infection rates and ultimately hospitalizations, illness, disability, and death due to COVID-19. The mandate has a real relation to that goal, as it incentivizes individuals get vaccinated in order to enjoy indoor recreational activities in the City and ensures that those participating in indoor recreational activities are less likely to spread the virus to others. Because the regulation also survives intermediate scrutiny, discussed below, the government has demonstrated that the vaccine mandate also survives judicial scrutiny under the lower *Jacobson* standard.

2. Plaintiffs' First Amendment Claim Is Unlikely to Survive Intermediate Scrutiny

The Plaintiffs' First Amendment claim is unlikely to succeed under a traditional Constitutional analysis. A law that does not "target speech based on its communicative content" is content neutral. *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2371 (2018). If a regulation "'serves purposes unrelated to the content of expression,'" it is content neutral, "'even if it has an incidental effect on some speakers or messages but not others.'" *Geller I*, 2020 WL 2520711, at *3 (quoting *Hobbs v. Cty. of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005)). "'[A]

23

regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself or the listener's agreement or disagreement with those contents, is deemed content-neutral . . . [And a] restriction designed to serve a governmental need to protect the security of the audience targets the speech's secondary, rather than its primary, effect.'" *Id.* (quoting *Hobbs* 397 F.3d at 150).

A content-neutral regulation need only survive intermediate scrutiny. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006); *see Geller I*, 2020 WL 2520711, at *3 (citing *Hobbs*, 397 F.3d at 148). Intermediate scrutiny demands that the regulation be "reasonable," "narrowly tailored to serve a significant governmental interest, and leave[s] open ample alternative channels for communication of the information." *Hobbs* 397 F.3d at 149 (citation omitted). "The narrow tailoring requirement is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id.* Thus, a restriction "need not be the least restrictive or least intrusive means of doing so." *Id.*

In the Second Circuit, vaccine mandates have already been upheld against First Amendment attack in the "free exercise clause" context as facially neutral regulations. *See Kane v. De Blasio*, --- F.4th ----, 2021 WL 5549403 (4th Cir. Nov. 28, 2021). It extends that such mandates would be held facially neutral in a free speech context. Specifically, in *Kane v. De Blasio*, the Second Circuit held that New York City's mandate requiring individuals who work for New York City schools be vaccinated against COVID-19 "does not violate the First Amendment on its face." *Id.* at *1. In holding that the mandate was "in all its iterations, . . . neutral and generally applicable," the Second Circuit pointed out that the mandate applied equally to "'all DOE [Department of Education] staff,' as well as City employees and contractors of DOE and the City who work in DOE school settings," it could not be said to "single out employees who decline

vaccination . . . Its restrictions apply equally to those who choose to remain unvaccinated for any reason." *Id.* at *6. So too here. The Key to NYC mandate applies equally to all theatres and comedy clubs, indeed to all recreational businesses, in the City.

The vaccine mandate in this case is a content-neutral regulation. Like other COVID-19-related regulations, it only "does not target the contents of the speech itself or the listener's agreement or disagreement with those contents." *See Geller I*, 2020 WL 2520711, at *4. At most, it targets secondary effects of speech, as it is designed to protect people who attend *indoor gatherings* with large groups of people from "the spread of a novel virus for which there currently is no cure or effective treatment." *See id.* While Plaintiffs allege that the mandate specifically targets their "constitutionally protected" activity, which is "the 'essential artform of democracy'" (Mot. At 13-14), many of the businesses covered by the very same mandate are not involved in the dissemination of content, like the plaintiffs and other artistic venues and museums and galleries. The mandate applies equally to a wide a range of indoor business activities, including gyms, zoos, arcades, and children's "play areas." Plaintiffs' argument that the mandate restricts theatres and comedy clubs based on the content of their speech does not square with the actual text of the mandate. The mandate is facially neutral.

What plaintiffs are really arguing is that, because they engage in constitutionally protected artistic activity – unlike gyms, zoos or arcades – the mandate somehow affects them differently than it does those other indoor activities to which it applies. But that argument does not address the content-neutrality of the mandate. Moreover, for the reasons discussed above, that is simply wrong. The plaintiffs' First Amendment rights are in no way compromised by the fact that unvaccinated people cannot enter their premises; plaintiffs are still free to present their performances, so the exercise of their First Amendment rights is unaffected by the mandate.

Applying intermediate scrutiny, the regulation is reasonable and narrowly tailored to serve a significant government interest. As the Supreme Court has found, "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese*, 141 S. Ct. at 67. And in the Second Circuit has agreed, in the context of mandatory vaccination of healthcare workers, that the government "has an indisputably compelling interest in ensuring" vaccinations against COVID-19, "to prevent . . . infection" and "to prevent an overburdening of the healthcare system." *We The Patriots USA*, 17 F.4th at 266. Similarly, the Second Circuit agreed in the context of school vaccine mandates that requiring vaccines in "Attempting to safely reopen schools amid a pandemic that has hit New York City particularly hard . . . was a reasonable exercise of the State's power to act to protect the public health." *Kane*, 2021 WL 5549403, at *7 (applying rational basis review to vaccine mandate).

Here, the government explains that the vaccine mandate was enacted in the midst of the COVID-19 pandemic to "incentiviz[e]" vaccination, reduce hospitalizations, illness, disability, and death, and prevent further economic damage from viral outbreaks. (Opp. at 16). The government proffers by declaration that vaccination can "delay, or possibly prevent, the emergence of more dangerous variants" of the COVID-19 virus (*id.* at 5) and a vaccinated individual "is at substantially lower risk of spreading infection to household members and the community." (*Id.*). Mandating vaccination helps ensure that individuals who enter an "indoor facility" are less likely to spread or contract the virus. (*Id.*). The Defendant also offers statistics which indicate that many people in the City – even the vaccine hesitant – are motivated toward vaccination by the prospect of being able to return to "normal" life, including attending indoor recreational activities. (*Id.* at 8, 10).

Here, there is a compelling interest in mandating vaccination to participate in indoor recreational activities in order prevent the spread of infection and "to prevent an overburdening of the healthcare system." *We The Patriots USA*, 17 F.4th at 266. Plaintiffs in fact agree that the government "has a compelling interest in protecting public health by preventing the spread of an infectious disease." (Mot. at 20). Because the mandate is content neutral and narrowly tailored to serve the government's significant public health interest, Plaintiffs are unlikely to succeed on their First Amendment claim.

3. Plaintiffs' Equal Protection Claim Is Unlikely to Succeed Rational Basis Review

Plaintiffs' equal protection claim is also unlikely to succeed on the merits.

"To prevail on an equal protection claim, 'a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" *Reynolds v. Quiros*, 990 F.3d 286, 300 (2d Cir. 2021) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)). Once a Plaintiff has demonstrated a differential treatment, if a "classification 'neither proceeds along suspect lines nor infringes fundamental constitutional rights,' it must 'be upheld against equal protection challenge if there is any reasonable state of facts that could provide a rational basis for the classification.'" *Ctr. Reprod. L. & Pol'y v. Bush*, 304 F.3d at 197 (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).

In this case, Plaintiffs have not demonstrated that they are treated differently from any similarly situated enterprises. The plaintiff theatres are engaged in activity that is at once commercial (Plaintiffs charge admission for their programs), recreational (persons attend plays and comedy shows in order to amuse themselves) and artistic (which alone among their qualities implicates the First Amendment). Other theatres and comedy clubs tick the same boxes, as do

museums, galleries, movie theatres, music halls and other performance venues. All of those are covered by the mandate.

Plaintiffs contend that they are similarly situated to three enterprises – schools, churches and social services agencies – which are not subject to the mandate. But none of those enterprises ticks off all three boxes, so Plaintiffs cannot credibly claim that they are similarly situated to schools, churches or social services. Schools and churches, like theatres and comedy clubs, engage in First Amendment protected activity; but that activity is neither commercial nor recreational in nature. Neither is the provision of social services commercial or recreational. Schools and social service agencies carry out essential functions – education, life support – that have long been considered the province of government (although government alone does not provide them); theatres and comedy clubs do not. The entities that have been identified by Plaintiffs simply are not "similarly situated" to them.

Plaintiffs' argument that they are being treated differently from schools or social services also loses force in light of the fact that there are separate vaccine mandates that apply to schools and social services in the City. *See, e.g.*, E.E.O. 75, 76, 78, 83. For example, school children have long been subject to vaccine requirements, a requirement upheld by the Second Circuit under rational basis review years before the COVID-19 pandemic. *See Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015). More recently, the COVID-19 school vaccine mandate requires that all DOE staff and employees and contractors of the DOE working in New York City schools get vaccinated against the virus. *See Kane*, 2021 WL 5549403, at *7. The Second Circuit again upheld

that vaccine mandate against Constitutional challenge under rational basis review. *See id.*[3] I see no reason why I should come out differently here.

In this case, the government provides a rational basis for the classifying the plaintiff theatres and comedy clubs as "indoor recreational businesses" because they are in fact "indoor recreational businesses" in a way that schools, churches and social service agencies are not. And the government also provides a rational reason to subject indoor recreational businesses to the vaccine mandate while not subjecting non-commercial, non-recreational services to the same mandate – in seeking to incentivize vaccination to prevent the spread of COVID-19, the government considered statistics that indicated that many people in the City are motivated to get vaccinated by being able to participate in indoor recreational activities. (Opp. at 8, 10). Thus, the mandate, which requires vaccination for the enjoyment of indoor recreational businesses, was conceived of to advance legitimate public health goals (reducing the spread of infection and promoting interest in vaccination) in a manner that both (i) allows those businesses to remain open and, in the case of the Plaintiff theatres, to engage in First Amendment-protected activity; and (ii) permits everyone, including the unvaccinated, from accessing non-commercial, non-recreational services. In that way, it is very much narrowly tailored to achieve the government's significant public health goals.

The classification set forth in the mandate is likely to survive rational basis review.

---

[3] COVID-19 vaccine mandates applying to City social services have been challenged but the lawsuits were dropped before being decided (under Second Circuit precedent to date, it seems most likely the challenges could not survive). *See NYC Unions Reach Deal to Drop Lawsuits Over Vaccinations*, U.S. News (Nov. 4, 2021), https://www.usnews.com/news/best-states/new-york/articles/2021-11-04/4-nyc-unions-reach-deal-to-drop-lawsuits-over-vaccinations.

### III.    Irreparable Harm, Balance of the Equities, and Public Interest

Having found Plaintiffs failed to demonstrate a likelihood of success on the merits of their First and Fourteenth Amendment claims, the Court need not rule on the remaining elements. *See Geller I*, 2020 WL 2520711, at *5 (citing *Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 853 (2d Cir. 1996)) ("[I]n the First Amendment context a finding of irreparable harm is contingent on a plaintiff's likelihood of success on the merits"); *Geller II*, 476 F.Supp.3d at 20.

However, the irreparable harm element likewise weighs against the grant of a preliminary injunction. "Irreparable harm must be imminent and incapable of being cured by monetary remedies." *Hopkins Hawley LLC*, 518 F.Supp.3d at 717 (citing *Shapiro v. Cadman Towers*, 51 F.3d 328, 332 (2d Cir. 1995)); *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003) ("[O]nly harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief."). Here, Plaintiffs' alleged injuries are at most financial – loss of ticket sales, revenue, and related costs "caused by the COVID-19 pandemic and its accompany restrictions." *See Hopkins Hawley LLC*, 518 F.Supp.3d at 717. Taken as true, these injuries are capable of being cured by monetary damages and cannot justify a preliminary injunction.

The balance of equities and public interest factor – merged where the government is a party (*see We The Patriots USA, Inc.*, 17 F.4th at 266) – also weigh against the grant of a preliminary injunction. Each favors the government here. As explained above, the Supreme Court has expressed that the government has a compelling interest in halting "the spread of COVID-19," *Roman Catholic Diocese*, 141 S. Ct. at 67, and the Second Circuit has advised that the government "has an indisputably compelling interest in ensuring" vaccinations against COVID-19, "to prevent an overburdening of the healthcare system." *We The Patriots USA*, 17 F.4th at 266. And courts in

this Circuit have routinely refrained from "quarterback[ing] the [government's] response to the COVID-19 pandemic from the bench." *Hopkins Hawley LLC*, 518 F.Supp.3d at 717; *see Geller I*, 2020 WL 2520711, at *4 ("As there is no evidence to suggest that the City has misunderstood the dangers of person-to-person spread of COVID-19, the Court declines to second guess the City's measure that clearly seeks to mitigate this risk."). I likewise will not.

As many courts have noted, the COVID-19 pandemic poses a dangerous public health risk, the rampant spread of the disease threatens to overburden the hospital system and increase the risk of death and serious illness. The government has explained that vaccination slows infection rates and reduces the spread of the disease; requiring vaccination to participate in indoor recreational activities is reasonable measure to incentivize vaccination, which is clearly the interest of the public health. The final elements, like the others, weigh against the grant of a preliminary injunction.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is DENIED.

The clerk of court is directed to close the motion at docket number 12.

This constitutes the decision and order of the court. This is a written opinion.

Dated: December 3, 2021

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

31